UNITED STATES of America,
Plaintiff,

v.

Dustin Lee HONKEN, Defendant.

No. CR 01–3047–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Jan. 29, 2004.

Alfredo G. Parrish, Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Gribble, LLP, Des Moines, IA, Charles Myers Rogers, Wyrsch, Hobbs & Mirakian, PC, Kansas City, MO, Leon F. Spies, Mellon & Spies, Iowa City, IA, for Defendant.

Charles J. Williams, Patrick J. Reinert, U.S. Attorney's Office Northern District of Iowa, Cedar Rapids, IA, Thomas Henry Miller, AAG, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING GOVERNMENT'S MOTION FOR ANONYMOUS JURY (FILED UNDER SEAL)

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ......................................................... 882
  A. The Prosecutions .................................................. 882
     1. The 1993 case ................................................. 882
     2. The 1996 case ................................................. 883
     3. The present case ............................................. 883
  B. The Motion For An Anonymous Jury ................................. 888
  C. Additional Submissions In Support Of The Motion .................. 889
     1. 1998 Sentencing transcript ................................... 889
        a. Evidence of attempts to obstruct justice .................. 889
           i. Testimony of Daniel Cobeen ............................ 889
           ii. Testimony of Timothy Cutkomp ......................... 890
           iii. Testimony of Dean Donaldson ......................... 891
           iv. Testimony of Terry Bregar ............................ 892
           v. Testimony of Dennis Putzier ........................... 892
           vi. Testimony of Dana Rasmussen .......................... 893
        b. Evidence of an attempt to escape ......................... 893
           i. Further testimony of Terry Bregar ..................... 893
           ii. Testimony of David Leavitt and Derek Boggs .......... 894
           iii. Further testimony of Dennis Putzier ................. 894
           iv. Testimony of William Garrison ........................ 894
           v. Testimony of Lynette Redden .......................... 894
     2. Affidavits .................................................... 895
     3. Paper on anonymous juries ..................................... 895

II. LEGAL ANALYSIS ...................................................... 895
  A. Should An "Anonymous" Jury Be Empaneled? ......................... 895
     1. Arguments of the parties ..................................... 895
     2. A matter of nomenclature ..................................... 897

3. The rights at issue .................................................898
4. Applicable standards ..............................................899
   a. Case law standards ...........................................899
      i. Need to protect the jury ..................................900
      ii. Precautions to minimize prejudice to the defendant .........902
   b. 18 U.S.C. § 3432 ..............................................903
      i. The statute ..............................................903
      ii. Judicial interpretations ................................903
      iii. The burden of proof .....................................904
      iv. Pertinent criteria for an anonymous jury .................905
5. Analysis .........................................................906
   a. Need to protect the jury .....................................906
      i. Present or future capacity to harm jurors .................906
      ii. Potential sentence .......................................910
      iii. Extent of publicity .....................................911
   b. Precautions to minimize prejudice to the defendant .............913
      i. Presumption of innocence ..................................913
      ii. Impartial jury ...........................................915
      iii. Other concerns ..........................................917
B. The Proper Degree Of "Anonymity" ................................918
   1. Arguments of the parties ......................................918
   2. Analysis ......................................................919
      a. Degrees of anonymity ......................................919
         i. The "innominate" jury ..................................919
         ii. Limited anonymity .....................................919
         iii. A high degree of anonymity ...........................920
         iv. An anonymous and sequestered jury ......................920
      b. The degree of anonymity required here .......................921
C. Further Prohibitions On Disclosure Of Juror Identity .............922

III. CONCLUSION ....................................................924

In this death penalty case, involving the alleged murder of five witnesses to the defendant's drug-trafficking or other alleged criminal conduct,[1] the government has moved the court to empanel an "anonymous" jury to protect the jury from the alleged threat to their safety posed by the defendant and his associates. The defendant, however, contends that such a step would deprive him of the presumption of innocence and impede his ability to obtain a fair and impartial jury by means of effective voir dire. He also contends that 18 U.S.C. § 3432 demonstrates Congress's recognition that, even in a capital case, a defendant is entitled to know the identity of the people who will determine his guilt or innocence. The question presented thus requires a delicate balancing of competing interests. The court held a hearing on the motion for an anonymous jury on January 17, 2004, and now enters this written ruling on that motion and related issues.

## I. INTRODUCTION

### A. The Prosecutions

#### 1. The 1993 case

The pertinent background to the government's motion for an anonymous jury in this case begins with a survey of the vari-

---

**1.** The charges on which the government has given notice of intent to seek the death penalty are murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, and murder while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

ous prosecutions of defendant Dustin Lee Honken in this judicial district. Honken was first prosecuted for drug-trafficking offenses in this district in 1993 in Case No. CR 93–3019 ("the 1993 case"). As the Eighth Circuit Court of Appeals explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted appellee for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

*United States v. Honken,* 184 F.3d 961, 963 (8th Cir.), *cert. denied,* 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999). Thus, the first prosecution of Honken in this district did not lead to a conviction.

### 2. The 1996 case

Honken was again indicted on drug-trafficking charges on April 11, 1996, this time with co-defendant Timothy Cutkomp, in Case No. CR 96–3004–MWB ("the 1996 case"). Count 1 of the Indictment in the 1996 case charged Honken and Cutkomp with conspiracy to distribute, manufacture, and attempt to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Count 2 of the original Indictment in the 1996 case charged Honken with possessing and aiding and abetting the possession of listed chemicals, in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2, and Count 3 charged possession and aiding and abetting the possession of drug paraphernalia intending to use such paraphernalia to manufacture and attempt to manufacture methamphetamine and listed chemicals, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2, respectively. *Id.,* Counts 2 & 3. A superseding indictment filed later in the 1996 case restated the first three charges and added a fourth charge of at-

tempting to manufacture methamphetamine. *See* Superseding Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Eventually, in 1997, Honken pleaded guilty to the conspiracy charge and the charge of attempting to manufacture methamphetamine, *i.e.,* Counts 1 and 4, and the government dismissed Counts 2 and 3. *See, e.g., Honken,* 184 F.3d at 963. Honken is now serving his sentence on Counts 1 and 4 in the 1996 case.

### 3. The present case

The present prosecution began with the filing of a seventeen-count indictment against Honken on August 30, 2001, which brought a variety of charges arising from Honken's alleged murder and solicitation of murder of witnesses to his alleged drug-trafficking and other criminal activity, which had, for example, allegedly brought the 1993 prosecution to its abrupt conclusion and had been intended to impede prosecution of the 1996 case. On August 23, 2002, a Superseding Indictment was handed down in this case, amending Counts 8 through 17. *See* Superseding Indictment (docket no. 46). Because the government relies, in part, on the allegations in the Superseding Indictment as grounds for empaneling an anonymous jury, the court will examine the charges in this case in more detail.

Counts 1 through 5 of the Superseding Indictment charge "witness tampering." More specifically, each count alleges that Honken "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill" one of five witnesses: Gregory Nicholson, Lori Duncan (Nicholson's girlfriend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10), and Terry DeGeus. Count 1 alleges that Gregory Nicholson was murdered

1) with the intent to prevent Gregory Nicholson from attending or providing testimony at an official proceeding in the Northern District of Iowa, Case Nos. 93–20 M and CR 93–3019 [the 1993 case]; 2) with intent to prevent Gregory Nicholson from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846; and 3) with intent to retaliate against Gregory Nicholson for providing information to law enforcement relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846[;] and 4) with intent to retaliate against Gregory Nicholson for testifying before the Federal Grand Jury investigating the drug trafficking activities of DUSTIN LEE HONKEN and others, which killing is a first degree murder as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(A) & (C); 1513(a)(1)(A) & (B) and 1111.

Superseding Indictment, Count 1. Counts 2, 3, and 4 allege that Lori Duncan, Kandi Duncan, and Amber Duncan, respectively, were murdered

with the intent to prevent [them] from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is:

the tampering with Gregory Nicholson, a federal witness, in violation of Title 18, United States Code, Section 1512; and DUSTIN LEE HONKEN's unlawful contact with Gregory Nicholson, in contempt of court and in violation of DUSTIN LEE HONKEN's conditions of federal pretrial release in Case Nos. 93–20 M and CR 93–3019 [the 1993 case], in violation of Title 18, United States Code, Sections 3148 and 401, which killing of [each witness] is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Counts 2–4. Count 5 alleges that Terry DeGeus was murdered

with intent to prevent Terry DeGeus from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the distribution of methamphetamine, manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846, which killing of Terry DeGeus is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Count 5. The Superseding Indictment includes, in support of Counts 1 through 5, allegations of "Findings under 18 U.S.C. § 3591 and 3592," which the court finds it unnecessary to repeat here, because the government is not seeking the death penalty against

Honken on the "witness tampering" charges.

Count 6 charges Honken with soliciting the murder of witnesses, as follows:

Between about June 10, 1996, and February 24, 1998, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did solicit, command, induce, and endeavor to persuade Dean Donaldson and Anthony Altimus to engage in conduct constituting a felony that has as an element, the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States, that is: 1) the murder of Timothy Cutkomp, with the intent to prevent Timothy Cutkomp's attendance or testimony at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Sections 1512 and 1111; and 2) the murder of Daniel Cobeen with the intent to prevent Daniel Cobeen from attending or testifying at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Section 1512 and 1111, with the intent that Dean Donaldson and Anthony Altimus engage in such conduct and under circumstances strongly corroborative of that intent.

This is in violation of Title 18, United States Code, Section 373(a)(1).

Superseding Indictment, Count 6.

Count 7 charges Honken with conspiracy to tamper with witnesses and to solicit the murder of witnesses, as follows:

Between about July 1, 1993, and continuing thereafter, until about 2000, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit the following offenses against the United States:

1. To kill or attempt to kill another person with the intent to prevent the attendance or testimony of that person at an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(1)A);

2. To kill or attempt to kill another person with the intent to prevent communication by a person to a law enforcement officer of information relating to the commission or possible commission of a federal offense or violations of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(a)(1)(C);

3. To knowingly use intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding, in violation of Title 18, United States Code, Section 1512(b)(1);

4. To knowingly use intimidation, physical force, threats, or otherwise corruptly persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(b)(3); and

5. To solicit, command, induce, and endeavor to persuade a person to commit a felony that has as an element the use, attempted use or threatened use of physical force against the person or property of

another, specifically violations of 18 U.S.C. § 1512(a)(1)(A) & (C) (murder and attempted murder of individuals with intent to prevent them from testifying or communicating information to law enforcement officials) and 1512(b)(1) & (3) (knowingly using, or attempting to use, intimidation, force, threats or corrupt persuasion of an individual with intent to prevent them from testifying or communicating information to law enforcement officials) with the intent that such person engage in such conduct and under circumstances strongly corroborative of that intent, in violation of Title 18, United States Code, Section 373.

Superseding Indictment, Count 7. Count 7 includes fourteen numbered paragraphs of allegations of "Background to Overt Acts" and thirty numbered paragraphs of allegations of "Overt Acts" in furtherance of the conspiracy, which the court will not quote here.

Honken is also charged in Counts 8 through 12 of the Superseding Indictment in this case with five counts of murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. As they presently stand, each of these Counts charges the "conspiracy murder" of one of five people—Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively—as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is between 1992 and 1998 DUSTIN LEE HONKEN did knowingly and unlawfully conspired [sic] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

Superseding Indictment, Counts 8 through 12.

Counts 13 through 17 of the Superseding Indictment in this case charge Honken with the murder of the same five individuals, respectively, while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Those charges are as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry De-

Geus, Angela Jane Johnson, and Jeffery Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801 *et. [sic] seq.* occurring between 1992 and 2000, specifically:

[18 numbered paragraphs omitted].

From this continuing criminal enterprise, DUSTIN HONKEN and others derived substantial income and resources.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 13 through 17.

On June 10, 2003, the government filed its Notice Of Intent To Seek The Death Penalty Under 21 U.S.C. § 848 (docket no. 120), thereby giving notice of the government's intent to seek the death penalty on the "conspiracy murder" and "CCE murder" offenses in Counts 8 through 17. That Notice included the following allegations of "Future Dangerousness Of The Defendant," which the government contends are also relevant to its motion to empanel an anonymous jury:

The defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994). In addition to committing the murders charged in this case, the defendant has 1) engaged in a continuing pattern of violent conduct, 2) threatened others with violence, 3) demonstrated low rehabilitative potential, 4) a high custody classification, and 5) demonstrated lack of remorse, and committed one or more of the following: On various occasions, the defendant has threatened to kill Daniel Cobeen, Timothy Cutkomp, agents, investigators, chemists, and prosecutors involved in the prosecution of this case. The defendant has made plans and threatened to kill guards and escape from custody. The defendant has threatened to harm other individuals who cooperate. After the search of his residence in 1996, the defendant developed a plan to obstruct justice and destroy evidence by locating cooperating individuals, purchasing a gun, destroying evidence, locating officers and other public officials in his case and harming them, while using the electronic monitoring device as an alibi. While incarcerated in the Woodbury County Jail, pending trial and sentencing, the defendant attempted to escape and assisted in the planned escape of Dennis Putzier. While incarcerated in the Woodbury County Jail, pending trial and sentencing, the defendant solicited others to bond out of county jail with the purpose of those individuals killing Timothy Cutkomp and Daniel Cobeen, who were cooperating individuals. On February 25, 1998, defendant was sentenced for one count of conspiracy to distribute and manufacture 100 grams or more of methamphetamine or 1,000 grams or more of a mixture or substance containing a detectable amount of methamphetamine; and one count of attempt to manufacture 100 grams or more of methamphetamine on February 7, 1996. While incarcerated in the United States Penitentiary in Florence, Colorado, following sentencing the defendant identified cooperating individuals and disseminated information in the form of "snitch packets" in an effort to assist others in identifying and harming cooperating individuals. While incarcerated in the United States Penitentiary Florence, the defendant developed a

plan and solicited individuals to join in his plan to escape from custody by overpowering and killing guards, stealing weapons, and amassing cash by committing crimes for the purpose of killing cooperating individuals and law enforcement officials involved in the investigation and prosecution of the defendant and Angela Johnson. The defendant has demonstrated a lack of remorse by boasting about killing his "rats" (cooperating individuals), encouraging others to kill cooperating individuals, and, in one or more conversations, indicating that the killings of the victims did not bother him. The defendant has had a number of disciplinary reports and has been placed in segregation as punishment for misconduct while incarcerated. The defendant's custody classification within the Bureau of Prisons is high and the defendant is incarcerated in a high-level institution, that is a United States Penitentiary.

Notice Of Intent To Seek The Death Penalty at 2–4, 6–8, 10–12, 14–16, and 18–20. This matter is presently set for trial beginning on April 5, 2004, with jury selection to begin on March 15, 2004, although the defendant's motion to continue the trial is currently pending.

### B. The Motion For An Anonymous Jury

On September 16, 2003, the government filed its Motion For Anonymous Jury (docket no. 150), which is currently before the court. In that motion, the government requests that the court empanel an anonymous jury in this case; submit a proposed jury questionnaire to the jury to assist with jury selection; and obtain criminal histories of members of the jury venire to compare with the criminal histories disclosed by the venire members themselves, in response to the questionnaire, then inform the parties of any criminal history not self-disclosed. Honken resisted the

motion in its entirety on September 24, 2003 (docket no. 153).

By sealed order dated November 26, 2003 (docket no. 169), the court set an evidentiary hearing on the government's motion for an anonymous jury and also set oral arguments on other matters for January 15, 2004. In that order, the court also stated its preliminary, *sua sponte* determination to close to the public the proceedings on whether or not to empanel an anonymous jury. The court also set a briefing schedule for the parties to respond to several issues raised by the court concerning the motion for an anonymous jury, including the following: (1) whether or not the government intended to present evidence via live witnesses; (2) if the government did intend to present evidence, whether or not the defendant would consent to appear at the hearing by videoconferencing or would instead stand on his right to be personally present at the hearing; (3) the degree to which the jury should be "anonymous" or "innominate"; (4) the extent to which prohibitions upon disclosure of the identity of or other information about jurors, or attempts to discover such information, should be imposed upon the parties, their counsel, court and clerks' office personnel, and the news media; and (5) whether the parties had any objections to closure of the hearing on the government's motion for an anonymous jury, or had suggestions of any alternatives to closure of the hearing. *See* Order of November 26, 2003.

The parties' responses regarding the issues identified by the court in its November 26, 2003, order were not as complete as the court might reasonably have hoped. The government filed a response on December 19, 2003, indicating the government's opposition to closure of the hearing; the government's intent to rely upon transcripts and affidavits rather than live wit-

nesses at the hearing; the government's position on the kinds of information about jurors that should be either withheld from or disclosed to the parties and the public; and the measures that the government believed that the court could properly take to maintain confidentiality of the jurors' identities. However, the defendant filed a response only to the court's preliminary determination that the hearing should be closed, and that belatedly, in which the defendant stated his concurrence in the court's preliminary determination to close the hearing. Thus, the defendant failed to file a written response to the other issues raised by the court in its November 26, 2003, order.

By order dated January 7, 2004, this court confirmed its order closing the proceedings on whether or not to empanel an anonymous jury. Owing to various conflicts, the hearing on the motion for anonymous jury was rescheduled for January 17, 2004. In response to the government's notice that it did not intend to present live witnesses at the hearing on the motion for an anonymous jury, Honken waived his right to be personally present and agreed to appear by video-conferencing. *See* Defendant's Written Waiver Of Personal Appearance At Hearing Scheduled January 17, 2004 (docket no. 192). While Honken appeared by video-conferencing, his attorneys appeared "live." They were Alfredo Parrish of Parrish Kruidenier Moss Dunn Boles Gribble & Cook, L.L.P., in Des Moines, Iowa; Leon F. Spies of Mellon & Spies in Iowa City, Iowa; and Charles Rogers, Attorney at Law, in Kansas City, Missouri. The United States was represented by C.J. Williams, Assistant United States Attorney, in Cedar Rapids, Iowa, and Thomas H. Miller, Assistant Iowa Attorney General and Special Assistant United States Attorney for this case.

### C. Additional Submissions In Support Of The Motion

#### 1. 1998 Sentencing transcript

At the hearing on January 17, 2004, in addition to the Superseding Indictment and Notice Of Intent To Seek The Death Penalty, the government submitted three exhibits in support of its motion for an anonymous jury. The first exhibit is the transcript of Honken's sentencing, in 1998, on the charges to which he pleaded guilty in the 1996 case. *See* Government's Exhibit 1 (five volumes). Indeed, this transcript was the centerpiece of the government's argument for an anonymous jury in this case. Although Honken's defense counsel at the sentencing hearing attempted to impeach each of the witnesses concerning the testimony described below, the court finds that the evidence is sufficiently credible that it establishes each of the incidents described by the preponderance of the evidence. Therefore, the court will summarize the pertinent evidence from Honken's 1998 sentencing.

##### a. Evidence of attempts to obstruct justice

**i. Testimony of Daniel Cobeen.** First, Daniel Cobeen, a person Honken had recruited to assist him with manufacturing and distributing methamphetamine in 1993, and who acted as a confidential informant for law enforcement officers in their investigation of Honken, testified that Honken had threatened him directly, for example, by telling Cobeen that if Cobeen ever "crossed" him, "he knew somebody that could knock on [Cobeen's] door and boom," *see* Government's Exhibit 1, Vol. 1, pp. 53–54, 68;[2] that Honken had also alluded to having Gregory Nicholson "disappeared," *id.* at pp. 55–56, 66, 68; and that Honken identified a number of people

---

**2.** All citations to the sentencing transcript refer to the volume and page numbers of the transcript itself, not the Bates numbers in Exhibit 1.

that he felt needed to be killed, including three law enforcement officers. *See id.* at pp. 68. Although Cobeen admitted that Honken might have made these threats and discussed these things as a "scare tactic," *see id.* at 69, Cobeen testified that he "took [Honken] serious ... [b]ecause nobody had heard from Nicholson, and nobody had heard from another guy that was involved in it and the whole family, Nicholson's whole family." *Id.* at 71. Indeed, Cobeen was offered $7,000 by law enforcement officers, which he accepted, to relocate himself and his family temporarily, because Cobeen and the officers feared that he might suffer the same fate as Nicholson and his family if Honken discovered his cooperation with investigators. *See id.* at 46–48.

**ii. Testimony of Timothy Cutkomp.** Another witness at the sentencing, Timothy Cutkomp, the co-defendant in the 1996 case, also testified at length about his discussions with Honken concerning the disappearance of Greg Nicholson and his family, *see id.* at 223–31, and the disappearance of Terry DeGeus. *See id.* at 227–31. Cutkomp described a "hypothetical" Honken put to him in late 1993 or early 1994, after Nicholson's disappearance, describing in chilling detail how one could kidnap a person and one of his family members; force the person to make a videotaped statement exonerating the kidnapper of drug-trafficking activity and recanting statements to the police by threatening to kill their family member; then kill the person and the family member anyway to cover up the kidnapping. *See id.* at 224–25. Cutkomp testified . that shortly after that discussion, Honken tried to give Cutkomp a videotape, which Honken said was a videotape of Nicholson saying . Honken wasn't guilty of anything. Honken wanted Cutkomp to tell authorities ·that the tape had been given to him by Nicholson, so that it would be "admissi-

ble," but Cutkomp did not take or ever view the videotape. *Id.* at 225–26.

In reference to DeGeus's disappearance, Cutkomp related Honken's discussion with him about DeGeus having "disappeared," during which Honken asked Cutkomp "how far down farm equipment went when they were plowing or disking and stuff," which Cutkomp interpreted as an indication that Honken was worried that DeGeus was not buried deep enough. *Id.* at 227–28. Cutkomp also testified that, on several occasions, Honken talked about renting a backhoe, so that he could get rid of "loose ends," and wondered how to build an incinerator and how hot it needed to get to burn up a body completely. *Id.* at 229. Cutkomp also testified that Honken asked him how deep something needed to be buried to make sure that frost didn't pull it back up. *Id.* At some point in 1994, Cutkomp asked Honken what he thought the likelihood was that any of the witnesses who had disappeared would ever "show up" again, and Honken said "he was 99 percent sure that Greg [Nicholson] would never show back up again, but he was lesser percent sure of Terry [DeGeus]," which Cutkomp interpreted to mean that Honken "had buried the bodies of ... Greg and his girlfriend and the two kids deep enough that they wouldn't come back up, and he was worried that he hadn't buried Terry deep enough." *Id.* at 230–31. Cutkomp also confirmed that Honken was interested in having Daniel Cobeen killed. *Id.* at 250, Vol. 2, 268–69.

Cutkomp also described other plans Honken discussed or actions he took to obstruct justice besides killing witnesses. Cutkomp testified to helping Honken melt down a handgun with a blowtorch, then throw it in a ditch along a road, because Honken said it would "look bad" if he were found to have a gun, *id.* Vol. 1 at 231–32; Honken's contemplation of a plan to blow

up the place where evidence of methamphetamine lab equipment in his case was being tested, in an attempt to get rid of evidence, *id.* at 250; and Honken's interest in buying an electronic device or to find other means that would help him "fool" the ankle bracelet that he was wearing while under house arrest, so that he would have an alibi while killing witnesses. *Id.* at Vol. 2 at 266, 281–82.

### iii. Testimony of Dean Donaldson.

Another witness, Dean Donaldson, testified at the 1998 sentencing hearing that he met Honken in the Woodbury County Jail in 1996. *See id.* at 390–91. Donaldson testified that, while he and Honken were in jail together, Honken told him that witnesses against him "came up missing." *Id.* at 399. Donaldson said Honken told him that one of the witnesses, who owed Honken $30,000, had met Honken at an abandoned place in the country, and that Honken had shot him repeatedly, because "they don't die like they do on TV. He kept coming. . . ." *Id.* at 400. Donaldson said Honken then added that "dead people are real heavy." *Id.* at 401. Donaldson also recounted Honken's statements that he and Angela Johnson had strangled other witnesses, "a couple," with a drop cord, then buried them with a backhoe, but that he was worried about them "surfacing," which Donaldson took to mean either that they were buried shallow or that Honken was afraid that Angela Johnson would talk. *Id.* Donaldson also testified that Honken said that, if he had only had another week to "beat" the monitoring band on his leg, he would have taken care of all of the witnesses to the 1996 case "again." *Id.* at 402. Donaldson said that Honken specifically identified his targets as Daniel Cobeen, the United States attorney prosecuting the case, and a chemist from Chicago, and that he would "then come back and kill Angie [Johnson] because she was a witness to all—she was the key to a lot of things" and that she "was the last person

he was going to kill because she could link him to the '93 [case]," and he was afraid that "they," apparently meaning law enforcement officers, would put pressure on her, and he needed to eliminate that threat. *Id.* at 402–03.

Honken also discussed with Donaldson having someone "take out" Timothy Cutkomp. *Id.* Specifically, Donaldson testified that Honken asked Donaldson "to do it," and Donaldson "guess[ed] at that time [he] agreed to do it." *Id.* Donaldson testified that he and Honken discussed their plan to kill Cutkomp for several days, and that Honken eventually gave him directions "to his [Cutkomp's] folks' place," gave Donaldson a description of Cutkomp, and told him where Cutkomp worked and what kind of car he drove. *Id.* at 403–04. Donaldson explained that Honken planned to bond Donaldson out of jail, so that Donaldson could murder Cutkomp, by having another associate on the outside, Kathy Ricks, get collateral for Donaldson's bond. *Id.* at 404. Donaldson testified that he did, eventually, bond out in August 1996, and that Kathy Ricks had put up the bond for him to get out. *Id.* Donaldson testified that he and Honken discussed specifically how Donaldson was supposed to kill Cutkomp, including plans to put up a barricade on a road near Cutkomp's residence, and to shoot Cutkomp when he got out of his vehicle to remove the barricade. *Id.* at 406. However, their first plan had been for Donaldson simply to go to Cutkomp's house and to shoot him and his parents there, but Donaldson talked Honken out of that plan. *Id.* at 407. Honken also explained to Donaldson where he could park his car at an abandoned place near the road before shooting Cutkomp. *Id.* at 408. Honken also told Donaldson that he had a gun that Donaldson could use to kill Cutkomp, but Donaldson did not want to use that gun, in case it "went back to '93." *Id.* at 409. Honken also told Donaldson that

on certain days, Cutkomp went to work an hour early, which would be better for the hit, because it would be darker, and gave Donaldson a schedule of times that Cutkomp worked. *Id.* at 411. Honken also gave Donaldson an address where he could get "a deal" on a high-powered rifle night scope. *Id.* at 412. Honken also gave Donaldson directions to put Cutkomp's body in his car, and hide the car at the abandoned house, then toss the rifle he had used to kill him in a muddy pond that Honken identified. *Id.* at 414.

Donaldson also testified that Honken engaged him to send a typed letter from Des Moines to Daniel Cobeen's parents "advising [them] that it wouldn't be wise that their son shows up for court, for Dustin Honken's court." *Id.* at 414. Specifically, Honken directed that Donaldson was to buy an old typewriter, so that it couldn't be traced, *id.* at 415; dictated to Donaldson what he wanted the letter to say, and had Donaldson write it out, because he didn't want anything in his own handwriting, *id.* at 416; and had Donaldson write down the address to which he should send the letter, all with the purpose of trying to get Cobeen's parents to make Cobeen withdraw his testimony against Honken. *Id.*

In exchange for all of his assistance with eliminating witnesses against Honken, Honken promised Donaldson half of a ten-million dollar drug deal, which Honken believed that he could pull off after getting out of jail. *Id.* at 417. However, Honken and Donaldson also discussed an alternative plan, which involved Donaldson getting another person that he knew to do "the job" for five or ten thousand dollars. *Id.* Honken also arranged a code with Donaldson, involving references to the page, paragraph, words, and letters in a certain book, so that Donaldson could communicate with Honken in jail, as well as a list of various people outside of jail whom

Donaldson could contact for certain kinds of assistance. *Id.* at 421.

However, Donaldson testified that he never took any action in furtherance of the plans he and Honken had made after he bonded out of the Woodbury County Jail. *Id.* at 424–25. Donaldson then testified that, when he was sent back to the Woodbury County Jail in November 1996, he made some attempts to contact Honken, because he had seen him once, and could tell that he was angry, and he was threatened by another inmate who made some reference to Honken. *Id.* at 427–28. Donaldson also testified that Honken himself made hand gestures like he was shooting Donaldson on one occasion and called him a snitch. *Id.* at 429. Apparently, these events prompted Donaldson to cooperate with law enforcement officers in their investigation of Honken. *Id.* at 429–32.

*iv. Testimony of Terry Bregar.* Another witness who had been an inmate in the Woodbury County Jail with Honken for two weeks in late 1996, Terry Bregar, testified, quite reluctantly, about his contacts with Honken. Specifically, Bregar testified that Honken had told him that if Honken got out, "he could probably beat the whole thing," by killing the prosecutor and making witnesses "disappear." *Id.* at 507. Although Bregar admitted that lots of inmates talk about things like that, Honken was different, because he seemed more "serious" and "stern" about it. *Id.* at 508. Moreover, Bregar testified that Honken told him that he had "bonded somebody out to take care of some business and some affairs for him," but that the "guy" had let him down, leaving Honken "really irate." *Id.*

*v. Testimony of Dennis Putzier.* Dennis Leroy Putzier, another inmate at the Woodbury County Jail with Honken in the fall of 1998, albeit in a different cell block, also testified at the sentencing hear-

ing. Putzier testified that he was first introduced to Honken when Honken slid a note under his door. In that note, Honken identified himself as the person who had bonded Donaldson out of the Woodbury County Jail and asked Putzier if he knew Donaldson and felt that Honken could trust him. *Id.* at 566–67. However, Putzier testified that he never had face-to-face contact with Honken, because they were in different cell blocks. *Id.* at 567. Instead, they communicated by notes and by conversations through the fire door between cell blocks. *Id.* at 567–68. Putzier testified that Honken asked if Putzier's brother, LaDean Hummel, was capable of killing someone, because Honken was looking for someone to kill "this Tim, his partner, [who] was supposed to be telling on him." *Id.* at 568. Honken also expressed concern to Putzier that Donaldson might give "paperwork" and a "map" to law enforcement officers. *Id.* at 569. Putzier also testified that Honken hoped to beat his 1996 charges by "[h]av[ing] the witness disappear like they did in the one in '93." *Id.* at 571. Specifically, Putzier testified that Honken wanted to get rid of "Tim," presumably meaning Timothy Cutkomp, to beat the 1996 charges. *Id.*

### vi. Testimony of Dana Rasmussen.

Dana Rasmussen, who was Honken's cell mate in cell block G of the Woodbury County Jail in the winter of 1996–97, also testified at the sentencing hearing. Rasmussen testified that Honken "solicited from me to do a hit on this guy" who was the primary witness against Honken on the 1996 charges, but Rasmussen declined the request. *Id.* Vol. 4 at 879. Subsequently, Rasmussen testified, he and Honken discussed a plan to drive by the witness's parents' home, and do a drive-by shooting to shoot out the windows of the house. *Id.* To accomplish this, Rasmussen testified that Honken was going to give Rasmussen money to bond out of the jail, and once the witness had been intimidated

into refusing to testify, Honken would fire his attorney and share the refunded retainer with Rasmussen as well as a recipe for methamphetamine. *Id.* at 879–80. The intimidation scheme was to continue after the drive-by shooting, because Rasmussen was to "call [the witness] at his work and instruct him to get ahold of Dustin's lawyer, you know, and if he didn't that I knew where other family members—where his other family lived and that something would happen to them too." *Id.* at 881. Rasmussen testified that Honken drew him a map to find the witness's parents' house and had Rasmussen recopy it, because Honken didn't want anything in his own handwriting. *Id.* at 882. Although he no longer has Honken's map, Rasmussen gave an account of the detailed instructions that Honken gave him to find the witness's parents' home. *Id.* at 884–85. However, Rasmussen was eventually bonded out by a friend, not Honken, and took no steps to carry out Honken's plans for witness intimidation. *Id.* at 882.

### b. Evidence of an attempt to escape

#### i. Further testimony of Terry Bregar.

In addition to the testimony recounted above, concerning attempts to obstruct justice, Terry Bregar also testified regarding Honken's plans to attempt to escape from jail by knocking a hole through the jail wall, making a rope out of blankets to lower down accomplices, then using that rope to drag up a larger rope from outside to allow the inmates to climb down. *See id.* at 509–17. Although Bregar testified that he saw evidence of attempts by Honken and other inmates to make a hole between the cell blocks, the wall was too hard to penetrate, so Bregar covered the hole with some soap to hide it. *Id.* at 512. Bregar also saw Honken attempting to pick the lock to the fire door between two cell blocks, because the hole being made in

the exterior jail wall was not in the same cellblock where Honken was incarcerated, as well as Honken's attempts to use materials in the cells to make tools to make the holes in the interior and exterior jail walls. *Id.* at 513–15. On another occasion, Honken came to Bregar's cell to watch for outside accomplices to arrive in a car to help him escape, but the expected accomplices did not show up, despite Honken's statements that they had been paid to do so. *Id.* at 516.

**ii. Testimony of David Leavitt and Derek Boggs.** Another witness, David Leavitt, also an inmate in the Woodbury County Jail with Honken, confirmed some of Bregar's testimony regarding an escape attempt involving breaking a hole in the jail wall. *See id.* at 551–54. Specifically, Leavitt testified to seeing inmates patching a hole in the face of the wall of a cell with cardboard and some soap. *Id.* at 551–52. Leavitt also threaded some rope from a sheet for another inmate, Dennis Putzier, to assist in the escape attempt. *Id.* at 552–53. Putzier explained that the rope was to help get some tools into the jail to cut reinforcing bars in the wall where the inmates were attempting to make a hole. *Id.* at 553. However, Leavitt testified that he did not know who Honken was. *Id.* at 559. Similarly, Derek Boggs, another inmate, testified that Mr. Putzier was making the hole in his cell in the Woodbury County Jail, although he also testified that he saw Putzier passing notes to Honken. *Id.* at 562–63.

**iii. Further testimony of Dennis Putzier.** In addition to his testimony recounted above, Dennis Putzier also testified that he and other inmates in cellblock C were making a hole in the wall of a cell as part of a plan to escape. *Id.* Putzier testified that, when Honken learned of this escape plan, Honken asked him if he would be interested in making "Tim" disappear after he escaped, in return for which Honken

promised to "take care of [Putzier] forever." *Id.* at 571–72. Thereafter, Honken discussed with Putzier several ideas about how to complete the hole out of the jail, and Honken provided Putzier with a piece of a step that Honken had broken off, which he hoped would help Putzier to make the hole. *Id.* at 573–75. Putzier testified that Honken's involvement in the actual escape was that he would have a ride set up for Putzier, have stuff that they could use to enlarge the hole dropped off by accomplices, and have a place arranged for Putzier to stay after he escaped. *Id.* at 576. It was only towards the end that Honken became interested in trying to escape himself, and attempted to cut through a wall between the cell blocks or to open the fire door, so that he could escape through Putzier's hole through the exterior wall. *Id.* at 577–79. Putzier testified that the escape plan ended when he was moved to another cell block. *Id.* at 579.

**iv. Testimony of William Garrison.** William Garrison, another inmate in the Woodbury County Jail, also testified to seeing Honken and other inmates attempting to pound a hole through the wall in Honken's cell. *Id.*, Vol. 3 at 814. He also saw Honken attempt to use a coat hook to open the fire door between cell blocks C and D. *Id.* at 814–15.

**v. Testimony of Lynette Redden.** The inmate's testimony concerning an escape attempt was confirmed, at least in part, by the testimony of Lynette Redden, who was the jail administrator for the Woodbury County Jail at the time of Honken's incarceration there. Ms. Redden confirmed that a hole had been started in cell block C, which, if completed, would have reached the outside. *See id.* at 788. She also confirmed damage to a cell wall in Honken's cell in cell block D, and that jail staff had obtained reports from inmates

that Honken had been involved in causing that damage. *Id.* at 788–89. However, she also testified that the Woodbury County Attorney's Office declined to prosecute Honken for attempted escape. *Id.* at 792.

### 2. Affidavits

The second of three exhibits submitted by the government at the hearing on its motion for an anonymous jury are affidavits. The first affidavit is by Tobin Michael, Court Security Inspector for the United States Marshal Service, regarding the relative expense and manpower requirements for a "standard" jury, an "anonymous" jury, and a "sequestered" jury. *See* Government's Exhibit 2. The second affidavit is by William Basler, a Special Agent in the Iowa Division of Criminal Investigation, recounting information received during interviews with inmates at the United States Penitentiary in Florence Colorado, where Honken was incarcerated prior to his transfer to the United States Penitentiary in Marion, Illinois. *See* Government's Exhibit 2. At the hearing on January 17, 2004, the government was granted leave to submit a post-hearing brief on the question of the sufficiency of the affidavits to meet the standards for empaneling an anonymous jury in this death penalty case. [However, no such brief has ever been submitted.]

### 3. Paper on anonymous juries

Honken also submitted one exhibit at the January 17, 2004, hearing. That exhibit was a copy of a paper prepared by Lara Dolnik of Starr Litigation Services, Inc., in Scottsdale, Arizona, entitled "The Potential Impact Of Juror Anonymity On Juror Decision–Making." Defendant's Exhibit A. In that paper, the author discusses studies suggesting that an anonymous jury is more likely to find a defendant guilty and more likely to impose a harsher sentence.

## II. LEGAL ANALYSIS

As indicated in the court's November 26, 2003, order, the government's motion for an anonymous jury raises a number of complicated issues. Therefore, the court will consider these issues, and the parties' pertinent arguments, in turn, beginning with the essential question of whether or not to empanel an "anonymous" jury at all. If the court deems it appropriate to empanel an "anonymous" jury, the court will consider collateral issues, including the extent to which the jury should be "anonymous" or merely "innominate," and the extent to which prohibitions upon disclosure of the identity of or other information about jurors, or attempts to discover such information, should be imposed upon the parties, their counsel, court and clerks' office personnel, and the news media.

### A. Should An "Anonymous" Jury Be Empaneled?

#### 1. Arguments of the parties

In its original brief supporting its motion for an anonymous jury, the government argues, first, that an "anonymous" jury is necessary to protect jury members from the threat to their safety posed by the defendant and his associates. This is so, the government contends, because the defendant was involved with a criminal drug-trafficking organization; he has been indicted for killing witnesses; and he has previously attempted, and has solicited assistance in, the killing of other witnesses and government officials, both before and after he was incarcerated upon his plea of guilty in the 1996 case. The government contends that it can meet the burden of proof on the defendant's dangerousness, for purposes of empaneling an anonymous jury, on the basis of the indictment itself, without the need for any further evidence, and that, in this case, the indictment, notice of intent to seek the death penalty, and transcript of the defendant's sentenc-

ing on drug-trafficking charges in 1998 adequately support the need for an anonymous jury in this case. However, even supposing that it is necessary to look beyond these sources of information, the government points to the affidavits submitted at the January 17, 2004, hearing, particularly the affidavit of Special Agent Basler, as establishing the potential threat Honken poses to members of the jury if they are not kept "anonymous." The government also asserts that the potential that the defendant could face the death penalty or a very lengthy prison sentence also weighs in favor of protecting the jury, as does the potential for extensive publicity, which might expose the jurors to intimidation or harassment, by the media and others.

At the hearing, the government suggested that there were real disadvantages to the government, as well as to the defendant, in empaneling an anonymous jury, such as deprivation of the opportunity to perform any background investigation of the jurors, but that the circumstances were such that the government believed that the jury needed such protection. Consequently, the government asserts that it is not seeking an anonymous jury to obtain any tactical advantage. Also at the hearing, when pressed by the court on the relevance of case law standards for empaneling an anonymous jury in light of a statute, 18 U.S.C. § 3432, expressly applicable to that question in capital cases, the government argued that the case law standards were consistent with the statutory standards, so that they provided guidance in this case.

The government also argues that reasonable precautions can be taken to protect the defendant's rights, even if the jury is anonymous. Specifically, the government argues that the jury should be advised only that their identities are being concealed to protect them from unwanted contact by the parties or members of the press. In this way, the government argues that the defendant's right to a fair trial will not be implicated by giving the jury the impression that the defendant is dangerous or a threat to the jurors. The government also argues that its proposed questionnaire for the jury provides adequate information for the defendant to voir dire the jurors and to exercise his peremptory challenges, thus protecting his right to an impartial jury.

The recurrent theme in Honken's resistance to the government's motion for an anonymous jury is that the government has relied entirely on allegations and innuendo, not "facts," to try to meet its burden to show that an anonymous jury is appropriate. Honken contends that the government must show by the preponderance of the *evidence* that such a drastic step is appropriate, but has not presented any such *evidence*. Honken argues, further, that, even in a death penalty case, he has constitutional and statutory rights to a list of the venire members, including their names, addresses, and places of employment, for example, pursuant to 18 U.S.C. § 3432. Because the government cannot meet its burden on the basis of *evidence* of a threat to the jurors, Honken contends that his right to the presumption of innocence and his right to a fair and impartial jury, which would ordinarily be protected through effective voir dire, will be unduly prejudiced by empaneling an anonymous jury. He also contends that mere membership in a "drug organization" is not sufficient to warrant an anonymous jury; something more is required. However, Honken argues that there is nothing more. Instead, he points out that the government relies on stale allegations of events from seven to ten years ago, which show no present capacity on his part to harm or threaten to harm anyone. Honken also asserts that the potential for a death pen-

alty should not warrant empaneling an anonymous jury, in light of the fact that 18 U.S.C. § 3432 expressly requires disclosure of jurors' identities to the defendant in a death penalty case. As to potential publicity, the defendant argues that making the jury anonymous is likely to *increase* media attention to the case, to his further prejudice.

At the hearing, Honken also raised for the first time a contention that an anonymous jury would be prejudicial, because the study he submits as evidence indicates that anonymous juries are more likely to convict and more likely to impose harsher punishment than non-anonymous juries. Honken suggests that empaneling an anonymous jury invites a dangerous "group dynamic" that is different from the dynamic of individual jurors, whose names are public, performing a serious civic responsibility as individuals. Honken dismissed the suggestion that non-anonymous juries might be *more* likely to convict than anonymous juries to keep a person perceived by the jurors to be dangerous from coming after them, because there was no evidence to support such an hypothesis. Honken argued that the inevitable implication of juror anonymity to the jurors was that the defendant was so dangerous that jurors' identities had to be hidden, so the defendant must be guilty. Honken also argued that disclosure of a "list" of potential jurors, as required by 18 U.S.C. § 3432, in the absence of exceptional circumstances, necessarily contemplated disclosure of jurors' names. When pressed about what special value a juror's name would have, if the parties were provided with other identifying information, such as the juror's age, sex, city of residence, and nature of employment, defense counsel suggested that names indicated valuable information about ethnicity, as well as information from which a party or attorney might recognize that he or she actually knew the juror or had had some prior

contact with the juror, and would avoid the dangers of a jury acting out of a "group dynamic" rather than out of individual judgments regarding the facts. Honken also argues that, under § 3432, the court must find, by the preponderance of the evidence, that it is disclosure of the list of venire members that would jeopardize the life or safety of the jurors, not merely that Honken was, in the past, a dangerous person or involved with a dangerous enterprise.

Honken also argues that the government's proposed procedures are not sufficient to protect him from prejudice to his constitutional and statutory rights. He contends that the government's proposed questionnaire does not adequately protect his rights, because there is little assurance that the jurors will answer it accurately. He also contends that the government's proposed procedure precludes him from any independent investigation of the background of the potential jurors. Moreover, he contends that allowing only a government investigator, even one who reports only to the judge, to investigate the jurors presents an appearance of impropriety, if not actual bias.

### 2. *A matter of nomenclature*

As the Eleventh Circuit Court of Appeals has explained, "In the usual case, the parties know the names, addresses, and occupations of potential jurors, as well as those of any spouses, and use this information during voir dire to formulate questions probing for potential biases, prejudices, or any other considerations that might prevent a juror from rendering a fair and impartial decision." *United States v. Ross,* 33 F.3d 1507, 1519 n. 22 (11th Cir.1994), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995). Jurors about whom some or all of this

information is withheld are generally referred to as "anonymous."

However, as the Fifth Circuit Court of Appeals has observed, "[r]eferring to the jury as 'anonymous' is misleading." *See United States v. Branch*, 91 F.3d 699, 723 (5th Cir.1996), *cert. denied*, 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997). The court explained:

> Jurors are randomly summoned from the community at large to decide the single case before them and, once done, to "inconspicuously fade back into the community." *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *see also* 3 William Blackstone, Commentaries *378. "Anonymous jury" has come to mean something different in recent years, signaling the district court's decision to withhold certain biographical information about potential jurors from the parties involved. That said, we should be wary of painting with too broad a brush. "Anonymous" juries include those about whom more has been concealed than here. *See, e.g., United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir.1994) (withholding names, addresses, places of employment, and spouses' names and places of employment), *cert. denied*, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995). The jurors here were not "anonymous" except in the most literal sense. The district court ordered only the jurors' names and addresses be withheld from the parties. Otherwise, the court provided the defendants with a wealth of information about the venire, including occupations and names of employers.

*Branch*, 91 F.3d at 723. In light of the information disclosed to the defendants, the court described the "anonymity" issue as a question of whether "to withhold biographical information about the jurors

from the parties." *Id.* It is in the sense of withholding biographical information about jurors that this court also uses "anonymous jury." If the court decides to empanel an "anonymous" jury, the court will consider below the degree of "anonymity" that is appropriate in this case, *i.e.*, the amount and type of biographical information about jurors that should be withheld or disclosed to the parties.

### 3. The rights at issue

In one of only two cases in which the Eighth Circuit Court of Appeals has considered the issue of anonymous juries, the court recognized that empaneling an anonymous jury may interfere with a defendant's Sixth Amendment right to trial by an impartial jury. *See United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir.1995), *cert. denied*, 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 569 (1996). The Ninth Circuit Court of Appeals recently explained the nature of such interference more fully, noting that "the use of an anonymous jury may interfere with defendants' ability to conduct voir dire and to exercise meaningful peremptory challenges." *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003); *cf. United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir.2002) ("Juror anonymity ... deprives the defendant of information that might help him to make appropriate challenges—in particular, peremptory challenges—during jury selection."), *cert. denied sub nom. Cox v. United States*, 538 U.S. 967, 123 S.Ct. 1761, 155 L.Ed.2d 522 (2003). In addition, the Ninth Circuit Court of Appeals observed that "anonymous juries may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence." *Id.; Mansoori*, 304 F.3d at 650 ("'An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors

must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence.'") (quoting *Ross*, 33 F.3d at 1519). In light of its potential impact on a defendant's rights, empaneling an anonymous jury has been variously described as "extreme," *Mansoori*, 304 F.3d at 650, "a last resort," *United States v. Edwards*, 303 F.3d at 606, 613 (5th Cir. 2002), *cert. denied*, 537 U.S. 1192, 123 S.Ct. 1272, 154 L.Ed.2d 1025 (2003), and "drastic." *United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir.1996) (quoting *United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir.1995), *cert. denied sub nom. Campos Alvarez v. United States*, 516 U.S. 1136, 116 S.Ct. 963, 133 L.Ed.2d 884 (1996) & *Perez Zamora v. United States*, 516 U.S. 1136, 116 S.Ct. 963, 133 L.Ed.2d 884 (1996)).

However, "'neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and court-room security....'" *Mansoori*, 304 F.3d at 650 (quoting *United States v. DiDomenico*, 78 F.3d 294, 301 (7th Cir.), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996)). Specifically, jurors may need to be protected from a real danger posed to their safety by the defendant or his associates or from harassment and intimidation by the parties, the news media, or the public. *See Darden*, 70 F.3d at 1532; *accord Shryock*, 342 F.3d at 971. In light of these concerns, the courts have fashioned standards for empaneling an anonymous jury that balance the defendant's interests against the interests of jurors and the public. *Mansoori*, 304 F.3d at 650 ("A

court weighing the need for an anonymous jury must therefore balance the defendant's interest in preserving the presumption of innocence and in conducting a useful voir dire against the jurors' interest in their own security and the public's interest in having a jury assess the defendant's guilt or innocence impartially."); *Edwards*, 303 F.3d at 613 ("This interest in juror protection must be balanced against the defendant's interest in effective voir dire and the presumption of innocence.").

### 4. Applicable standards
#### a. Case law standards

Although empaneling an anonymous jury potentially prejudices substantial rights of the defendant, the Eighth Circuit Court of Appeals has recognized that "every court that has considered the issue has concluded that *in appropriate circumstances* the empanelment of an anonymous jury does not infringe on the right to an impartial jury." *Darden*, 70 F.3d at 1532 (citing cases so holding) (emphasis added).[3] Therefore, the Eighth Circuit Court of Appeals in *Darden* adopted the holding of the Second Circuit Court of Appeals "that generally a court should not empanel an anonymous jury without 'a) concluding that there is strong reason to believe the jury needs protection, and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" *Id.* (quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied*, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992), and noting that these "guidelines" had been adopted by two other Circuit Courts of Appeals, citing *United*

---

**3.** Indeed, a statute applicable to all cases permits a district court to empanel an anonymous jury when "the interests of justice so require." 28 U.S.C. § 1863(b)(7). At least one court has stated that the case law standards described herein derive from this statutory authorization for an anonymous jury. *See United States v. Marrero–Ortiz*, 160 F.3d 768, 776 (1st Cir.1998).

*States v. Edmond,* 52 F.3d 1080, 1090 (D.C.Cir.), *cert. denied,* 516 U.S. 998, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995), and *Ross,* 33 F.3d at 1520).

Since the adoption of these two criteria in *Darden,* several other Circuit Courts of Appeals have also adopted them for determination of whether or not to empanel an anonymous jury. *See Shryock,* 342 F.3d at 971 ("[W]e now adopt the rule as articulated by the First Circuit: the trial court may empanel an anonymous jury 'where (1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused.' ") (quoting *United States v. DeLuca,* 137 F.3d 24, 31 (1st Cir.1998), *cert. denied,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998)); *Mansoori,* 304 F.3d at 650 ("Empaneling an anonymous jury is an extreme measure that is warranted only where 'there is a strong reason to believe the jury needs protection,' " quoting *United States v. Crockett,* 979 F.2d 1204 (7th Cir. 1992), *cert. denied,* 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993), in turn quoting *Paccione,* 949 F.2d at 1192, and is only permissible if " 'steps are taken to ensure that the defendant receives a fair trial,' " quoting *DiDomenico,* 78 F.3d at 301); *United States v. Brown,* 303 F.3d 582, 602 (5th Cir.2002) ("[A]n anonymous jury is constitutional 'when there is strong reason to believe the jury needs protection and the district court takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.' ") (quoting *Krout,* 66 F.3d at 1427), *cert. denied,* 537 U.S. 1173, 123 S.Ct. 1003, 154 L.Ed.2d 915 (2003); *United States v. Collazo–Aponte,* 216 F.3d 163, 181 (1st Cir.2000) ("In this Circuit, we have held that an anonymous jury is 'a permissible precaution where (1)

there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused.' ") (quoting *DeLuca,* 137 F.3d at 31), *vacated on other grounds,* 532 U.S. 1036, 121 S.Ct. 1996, 149 L.Ed.2d 1000 (2001); *United States v. Talley,* 164 F.3d 989, 1001 (6th Cir.) (also citing *Paccione* for these criteria), *cert. denied,* 526 U.S. 1137, 119 S.Ct. 1793, 143 L.Ed.2d 1020 (1999). Thus, it is safe to say that, at least in non-capital cases, these criteria are, or are nearly, universally applied to the question of whether or not to empanel an anonymous jury.

In *Darden,* the Eighth Circuit Court of Appeals held that, "[w]ithin these parameters, a district court's decision is reviewed under the deferential abuse-of-discretion standard." *Id.* Indeed, the Ninth Circuit Court of Appeals more recently noted that "[e]very circuit that has addressed this issue has held that a lower court's decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review," and adopted the same standard for that Circuit. *Shryock,* 342 F.3d at 970 (citing cases); *accord Mansoori,* 304 F.3d at 650; *Brown,* 303 F.3d at 582; *Edwards,* 303 F.3d at 613; *United States v. Dakota,* 197 F.3d 821, 827 (6th Cir.1999). Thus, whether or not to empanel an anonymous jury is a matter within this court's discretion.

*i. Need to protect the jury.* Courts have developed various factors to guide the court's discretion in whether or not to empanel an anonymous jury. As to the first criterion, the need to protect the jury, the Eighth Circuit Court of Appeals in *Darden* observed as follows:

In *[United States v.] Ross*, [33 F.3d 1507 (11th Cir.1994)], the Eleventh Circuit summarized its review of the case law concerning this issue by stating that

[s]ufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Ross*, 33 F.3d at 1520.

*Darden*, 70 F.3d at 1532. The Eighth Circuit Court of Appeals then applied this five-factor test to the case before it, *see id.* at 1532–33, as have numerous courts since. *See Shryock*, 342 F.3d at 971 (considering similar factors, citing, *inter alia, Darden*, 70 F.3d at 1532); *Mansoori*, 304 F.3d at 650–51 (same); *Brown*, 303 F.3d at 602 (relying on the same factors, citing *Krout*, 66 F.3d at 1427); *Edwards*, 303 F.3d at 613 (same). However, courts appear to be in agreement that these five factors "are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances." *Shryock*, 342 F.3d at 971; *accord Darden*, 70 F.3d at 1532 ("Several cases have approved the use of an anonymous jury because of the presence of some combination of these factors. *See Edmond*, 52 F.3d at 1091; *Ross*, 33 F.3d at 1520–21; *[United States v.] Crockett*, 979 F.2d [1204,] 1216 [(7th Cir.1992)]; *Paccione*, 949 F.2d at 1192–93."); *Brown*, 303 F.3d at 602 ("None of these factors is dispositive; rather, the decision to empanel an anonymous jury should be made on the totality of the circumstances."). Thus, application of this five-factor test of the need to protect the jury by withholding biographical information about them is, or is nearly, universal.

As to the kind of evidence required to demonstrate these factors, the Fifth Circuit Court of Appeals has explained,

Although the district court must base its decision on "more than mere allegations or inferences of potential risk [,]" [*Krout*, 66 F.3d at 1427], it may consider the indictment and affidavits submitted by the parties. *See United States v. Wilson*, 160 F.3d 732, 747 (D.C.Cir.1998) (relying on indictment and prosecutor's affidavit); *Krout*, 66 F.3d at 1427 (relying on unsworn affidavit). In view of the totality of the circumstances, the district court must "make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceeding." *United States v. Branch*, 91 F.3d 699, 723–24 (5th Cir.1996) (quoting *United States v. Childress*, 58 F.3d 693, 702 (D.C.Cir. 1995)). We will not find an abuse of discretion if the "evidence at trial supports the conclusion that anonymity was warranted." *Krout*, 66 F.3d at 1427.

*Edwards*, 303 F.3d at 613. The Fifth Circuit Court of Appeals also provided some useful guidance on when it may be appropriate to give particular weight to one factor or another, as follows:

As the *Krout* factors suggest, the paradigmatic situation justifying an anonymous jury is an organized crime trial, where the safety of the jurors becomes an overriding concern. *See, e.g., United States v. Salvatore*, 110 F.3d 1131, 1143–44 (5th Cir.1997) (upholding anonymous jury in case involving organized crime defendants), *overruled on other grounds by Cleveland [v. United States]*, 531 U.S.

12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000); *Krout*, 66 F.3d at 1427 (upholding anonymous jury in prosecution of member of Texas "Mexican Mafia"). This is not to say, however, that the withholding of juror information is appropriate only in organized crime cases. We have previously approved of an anonymous jury when the case attracts unusually large media attention and arouses deep passions in the community. In the *Branch* case [*United States v. Branch*, 91 F.3d 699 (5th Cir.1996)], we affirmed the district court's decision to withhold certain identifying juror information in the trial of former members of the Branch Davidian sect. Cautioning that "[n]ot all celebrated trials merit an anonymous jury," we nevertheless relied on the intense press coverage and the passions that the trial incited, even though there was no indication that any of the defendants would interfere with the jurors. *Branch*, 91 F.3d at 723–24. *Edwards*, 303 F.3d at 613–14. Similarly, the Sixth Circuit Court of Appeals has observed that "[t]he anonymity of the jury should be preserved in cases: 1) with very dangerous persons who were participants in large scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; 2) where defendants have had a history of attempted jury tampering and serious criminal records; or 3) where there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity." *Talley*, 164 F.3d at 1001 (citing *Paccione*, 949 F.2d at 1192, and cases cited therein).

**ii. Precautions to minimize prejudice to the defendant.** Courts have also identified measures that will satisfy the second criterion for empaneling an anonymous jury—*i.e.*, whether reasonable precautions can be taken " 'to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.' " *Darden*, 70 F.3d at 1532 (quoting *Paccione*, 949 F.2d at 1192). In *Darden*, the Eighth Circuit Court of Appeals found "that the District Court took reasonable precautions to ensure that the empanelment of an anonymous jury would not result in undue prejudice against the defendants," where "[t]he court told the venire persons that they were being identified by numbers rather than their names so that members of the media would not ask them questions," which the Eighth Circuit Court of Appeals noted was an approach approved by the Second Circuit Court of Appeals "several times." *Darden*, 70 F.3d at 1533 (citing cases). "Furthermore," the Eighth Circuit Court of Appeals noted, " '[w]here jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or the defendant himself,' " and found that such a voir dire had been conducted in that case. *Id.* (quoting *Ross*, 33 F.3d at 1520). Similarly, in *United States v. Peoples*, 250 F.3d 630 (8th Cir.2001), the trial court judge explained to the venire panel that the procedure of identifying them in court by numbers rather than by names "was being employed to reduce the possibility that the media or others interested in the issues of this case might try to contact them." *Peoples*, 250 F.3d at 635. The appellate court again approved this procedure, finding that "[t]he district court's explanation to the panel was reasonably calculated to ensure that the use of numbers did not cause undue prejudice," and that a similar statement had been approved in *Darden*. *Peoples*, 250 F.3d at 636.

Several other courts have taken a similar approach to protection of the defendant's rights. *See, e.g., Brown*, 303 F.3d at 602–03 (the trial court provided the

defendants with substantial information about the jurors through an extensive voir dire and an "exhaustive" 42–page juror questionnaire, and the appellate court held that "the [trial] court's efforts to provide the defendants with sufficient information on the jurors through extensive juror questionnaires and voir dire adequately protected the defendants' rights and permitted them to select a jury intelligently."); *Talley,* 164 F.3d at 1001–02 ("In deciding to empanel an anonymous jury, the court must ensure that the defendant retains his or her right to an unbiased jury by conducting 'a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself,' and by providing the jury a neutral and non-prejudicial reason for requiring that it be anonymous, so that jurors will refrain from inferring that anonymity was necessary due to the character of the defendant.") (quoting *Paccione,* 949 F.2d at 1192).

### b. 18 U.S.C. § 3432

***i. The statute.*** Honken, however, contends that the judge-made standards cited above are not necessarily applicable to a death penalty case, because, he contends, the question of whether or not to empanel an anonymous jury in a death penalty case is governed instead by 18 U.S.C. § 3432. The statute upon which Honken relies provides as follows:

> A person charged with treason or other capital offense *shall* at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, *except* that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may

jeopardize the life or safety of any person.

18 U.S.C. § 3432 (emphasis added).

What Honken finds interesting about this statute, first, is that it ordinarily *requires* disclosure of "a list of the veniremen ... stating the place of abode of each venireman"; an anonymous jury, on the other hand, is only permitted as an exception to this rule. *Id.* Second, Honken points out that there is a specific burden of proof that must be met before the defendant may be deprived of the list of venire members: the court must find *"by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." Id.* (emphasis added). Thus, Honken contends that the statute makes reliance on an indictment or a notice of intent to seek the death penalty inappropriate to the question of whether or not to empanel an anonymous jury in a death penalty case, because neither an indictment nor a notice constitutes "evidence"; each consists merely of allegations. Finally, Honken also points out that the five-factor test for determining whether jurors require protection, described above, has never been expressly applied to a capital case governed by § 3432. Indeed, Honken seems to suggest that the five-factor test goes far afield from the sole criterion identified in the statute, which is whether disclosure of the list of venire members, including their names and abodes, "may jeopardize the life or safety of any person." *Id.*

***ii. Judicial interpretations.*** Surprisingly few cases have interpreted this statute with regard to whether or not an anonymous jury was warranted in particular circumstances. *See, e.g., United States v. Scarfo,* 850 F.2d 1015, 1023 (3d Cir.1988) (noting that, in capital cases, § 3432 requires disclosure of names and addresses of prospective jurors three days before

trial, but observing that the court was not confronted with a capital case, so that it did not address the statutory requirements in that situation); *United States v. Barnes*, 604 F.2d 121, 143 n. 11 (2d Cir.1979) (observing that § 3432 is applicable only to capital cases, not non-capital cases), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Edelin*, 128 F.Supp.2d 23, 43–45 (D.D.C.2001) (applying the same standards for an anonymous jury in a capital case under § 3432 as were set forth in the non-capital cases of *United States v. Edmond*, 52 F.3d 1080 (D.C.Cir.), *cert. denied*, 516 U.S. 998, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995), and *United States v. Wilson*, 160 F.3d 732 (D.C.Cir.1998), *cert. denied*, 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999)).

However, in the second of only two cases in which the Eighth Circuit Court of Appeals has considered the issues of empaneling an anonymous jury, *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001), the court recognized that, pursuant to 18 U.S.C. § 3432, "[u]pon request, a person charged with a capital offense must be provided with a list of the names and places of residence of each member of the venire panel at least three days prior to trial, unless the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Peoples*, 250 F.3d at 635. The court explained, further, that "[t]he district court has wide discretion to empanel an anonymous jury if it finds that a person's life or safety is in jeopardy, or to require the use of numbers for identification in any case." *Id.* Thus, the Eighth Circuit Court of Appeals appeared to make a distinction between empanelment of an "anonymous" jury, that is, one in which jurors' names and abodes have not been disclosed to the defendant, in a death penalty case, *see* 18 U.S.C. § 3432, and merely using numbers to identify jurors in court, which may be appropriate "in any case." *Id.*

Two additional points should be noted about the *Peoples* case, for present purposes. First, although the defendants in that case were charged with and convicted of a "capital" offense, aiding and abetting the murder of a federal government witness in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2), and 1111, the death penalty apparently was never at issue. *See Peoples*, 250 F.3d at 634 ("The district court sentenced each of [the defendants] to life imprisonment without the possibility of parole."). Second, the trial court only imposed "anonymity" on the jury to the extent that the venire panel members were identified in court by numbers rather than by name; all parties were provided with a list of the names and places of residence of each member of the venire panel prior to trial. *See id.* at 635. Thus, "the procedures outlined in 18 U.S.C. § 3432" that the trial court followed in *Peoples* were the procedures for *disclosure* of the names and abodes of venire panel members, not the statutory procedures for withholding such information from the defendants. *See id.* at 635. Unfortunately, therefore, *Peoples* actually sheds little light on the circumstances in which the names and abodes of venire panel members can be withheld from the parties pursuant to § 3432.

■ *iii. The burden of proof.* The court finds that Honken is plainly right that the "preponderance of the evidence" standard is applicable to the question of whether an anonymous jury is appropriate in this death penalty case, in light of the explicit statement of that standard of proof in the applicable statute. *See* 18 U.S.C. § 3432. Moreover, the court is not convinced that either an indictment or a notice of intent to seek the death penalty, alone or together, would satisfy this standard, because neither an indictment nor a notice of intent to seek the death penalty is *evi-*

*dence* of anything; each merely contains allegations. *Compare Edwards,* 303 F.3d at 613 ("Although the district court must base its decision [to empanel an anonymous jury] on 'more than mere allegations or inferences of potential risk [,]' [*Krout,* 66 F.3d at 1427], it may consider the indictment and affidavits submitted by the parties."); *United States v. Wilson,* 160 F.3d 732, 747 (D.C.Cir.1998) (the district court did not abuse its discretion by not conducting an evidentiary hearing on the anonymous jury issue, where the court heard arguments of counsel and the government was relying principally on the charges in the indictment and the prosecutor's affidavit), *cert. denied,* 528 U.S. 828, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999); *United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995) ("The district court has discretion to determine whether or not an evidentiary hearing is needed on the government's allegations" supporting a request for an anonymous jury); *United States v. Eufrasio,* 935 F.2d 553, 574 (3d Cir.) ("A trial court has discretion to permit an anonymous jury without holding an evidentiary hearing on juror safety, if the court believes there is potential for juror apprehension."), *cert. denied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991). Thus, the court must decide whether "a preponderance of the evidence" weighs in favor of an anonymous jury in this case, not merely whether circumstances alleged in an indictment or notice of intent to seek the death penalty might *suggest* that such a procedure is warranted.

***iv. Pertinent criteria for an anonymous jury.*** Honken is also correct that § 3432 expressly provides that the controlling issue in deciding whether or not juror identity information should be kept from the defendant in a death penalty case is whether disclosure of such information "may jeopardize the life or safety of any person." 18 U.S.C. § 3432. However, the court sees this statutory criterion to be at least roughly analogous to the first requirement for empaneling an anonymous jury in any other case, which is whether "'there is strong reason to believe the jury needs protection.'" *Darden,* 70 F.3d at 1532 (quoting *Paccione,* 949 F.2d at 1192); *see also Edelin,* 128 F.Supp.2d at 43–44 (applying this criterion to the anonymous jury question in a death penalty case, after recognizing that § 3432 gives the court discretion to withhold the names of venire members in such a case). The difference, if any, appears to be that the statute expressly requires what may be a heightened standard of danger—jeopardy to life or safety—from which the jury needs protection.

Because the first of the criteria for an anonymous jury identified in *Darden* still appears to be pertinent to a death penalty case, the court is also not as quick to reject application of the five-factor test applicable to that criterion as Honken appears to be. Rather, the court finds that the five-factor test, as well as other factors, may be relevant to the determination of whether or not to empanel an anonymous jury under § 3432 in a death penalty case, *but only to the extent that those factors go to the question of whether or not an anonymous jury is required "to protect the life or safety of any person." See* 18 U.S.C. § 3432. Therefore, the court will not simply ignore those factors in its analysis of whether or not an anonymous jury is warranted in this death penalty case.

Similarly, even in the context of a death penalty case, the court deems it appropriate to consider the second criterion that courts have found to be relevant to the question of whether or not to empanel an anonymous jury in non-death penalty cases, that is, whether reasonable precautions can be taken "'to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are

protected.'" *Darden,* 70 F.3d at 1532 (quoting *Paccione,* 949 F.2d at 1192). This is so, the court believes, because in a death penalty case, the defendant's rights should be given at least as much protection as in any other case. *Accord Edelin,* 128 F.Supp.2d at 44–45 (stating, in a death penalty case to which the court recognized that § 3432 was applicable, that the court "fully intends to take whatever precautions possible to minimize the prejudicial effects on the defendants of having an anonymous jury, including using a questionnaire and extensive questioning in voir dire and providing a neutral explanation for the jurors' anonymity").

■ Consequently, the court's analysis of whether or not to empanel an anonymous jury in this death penalty case will be guided by the same two criteria set forth in *Darden:* (1) Are there strong reasons to believe that the jury needs protection? and (2) Can reasonable precautions be taken to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected? However, the court's analysis will also be controlled by the standards expressly set forth in § 3432 for any exception to disclosure of juror names and abodes, *i.e.,* proof *"by the preponderance of the evidence"* that disclosure of such information *"may jeopardize the life or safety of any person."* 18 U.S.C. § 3432 (emphasis added).

#### 5. *Analysis*
##### a. *Need to protect the jury*

■ As explained above, in non-capital cases, in considering the first criterion, the need for jury protection, courts have relied on the following non-exclusive, non-dispositive five-factor test: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if

convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment. *Darden,* 70 F.3d at 1532 (quoting *Ross,* 33 F.3d at 1520); *accord Shryock,* 342 F.3d at 971 (considering similar factors, citing, *inter alia, Darden,* 70 F.3d at 1532); *Mansoori,* 304 F.3d at 650–51 (same); *Brown,* 303 F.3d at 602 (relying on the same factors, citing *Krout,* 66 F.3d at 1427); *Edwards,* 303 F.3d at 613 (same). Again, this court finds that, in a capital case, in which the question of whether or not to empanel an anonymous jury is controlled by § 3432, this five-factor test, as well as other factors, may be relevant, but only to the extent that those factors go to the question of whether or not an anonymous jury is required "to protect the life or safety of any person." *See* 18 U.S.C. § 3432. Therefore, the court turns to consideration of the pertinent factors.

*i. Present or future capacity to harm jurors.* This court finds that the first three of the five factors enumerated in *Darden* and other decisions as pertinent to the question of whether the jury is in need of protection—(1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the capacity to harm jurors; and (3) past attempts to interfere with the judicial process, *see, e.g., Darden,* 70 F.3d at 1532—are, and often are treated as, interrelated. Moreover, the court finds that these factors all shed some light on the pertinent inquiry under § 3432 for death penalty cases, which is whether disclosure of jurors' biographical information "may jeopardize the life or safety of any person," such as a juror or his or her family members. Indeed, the court concludes that all three factors might be rephrased as a single consideration, at least for § 3432 cases:

Does the defendant, either by himself or through associates or an organization, have the present or future capacity to harm jurors?

For example, in *Darden*, the court concluded that the first three factors in the five-factor test were present, as follows:

Each of the nine defendants was charged with participating in an extraordinarily violent organized criminal enterprise. The enterprise had many members and associates who remained at large throughout the trial. The enterprise had an extensive history of conflict with the criminal justice system, including the intimidation and murder of government witnesses. Several of the defendants had criminal records including convictions for violent crimes such as armed robbery, rape, and murder.

*Darden*, 70 F.3d at 1532–33. Thus, *Darden* suggests that what matters is the *nature* of the criminal enterprise as one that has been in the past, or potentially could be in the future, involved in harming jurors, not merely whether the defendant belongs to some kind of "organization." That decision also suggests that a pertinent issue is whether members of that criminal organization or enterprise remain at large at the time of trial, such that they might have the ability to interfere with jurors. *See id.* (noting that "[t]he enterprise had many members and associates who remained at large throughout the trial"). In other words, the question is not just whether the defendant and his "organization" have attempted to interfere with the criminal justice system in the past, but whether the defendant has the present ability to do so, notwithstanding his incarceration, through his associates or "organization."

Subsequent decisions from other circuits support this reading of the import and interrelationship of the first three factors. *See Shryock*, 342 F.3d at 972 (noting that the defendants "were involved with the Mexican Mafia, an extraordinarily violent organized crime enterprise," the defendants had been involved in several murders or attempted murders on behalf of the Mexican Mafia, and at the time of trial, "there were hundreds of Mexican Mafia members and associates still at large," so that "[c]learly, the Mexican Mafia was a group with the capacity to harm jurors," and the record also showed that the defendants had previously attempted to interfere with the judicial process through false testimony and threatening, assaulting, killing, or attempting to kill potential witnesses in other cases); *Mansoori*, 304 F.3d at 651 (concluding that the circumstances did not warrant an anonymous jury, even though the case involved "elements of organized crime," because " 'something more' than the organized-crime label is required in order to justify juror anonymity," such as " 'a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendant[ ] and his associates such as would cause a juror to reasonably fear for his own safety,' " quoting *Crockett*, 979 F.2d at 1216, and holding that "the ability to intimidate jurors through associates who were not incarcerated" was not enough without "some evidence indicating that intimidation is likely," nor was there evidence of an unusual degree of violence in the drug-trafficking organization, sufficient to cause jurors to fear for their own safety); *Brown*, 303 F.3d at 602 (the district court properly concluded that an anonymous jury was warranted where several individuals involved in the case had "proven their ability to corrupt the legal system," and co-conspirators had pleaded guilty to witness tampering, which was sufficient to raise a concern that the defendants would attempt

to interfere with the judicial process or witnesses); *United States v. Bowman*, 302 F.3d 1228, 1238–39 (11th Cir.2002) (there was sufficient evidence to support an anonymous jury, where the defendant was the international president of a motorcycle gang with a history of violent conduct, the gang had interfered with the judicial process on several occasions, by seeking to intimidate witnesses, and the defendant himself was accused of kidnapping and murder to punish the victims for their communications with law enforcement officers), *cert. denied*, 538 U.S. 1001, 123 S.Ct. 1923, 155 L.Ed.2d 829 (2003); *Collazo–Aponte*, 216 F.3d at 182 (an anonymous jury was justified where "the indictment charged several defendants with murder, all defendants with membership in a violent, sprawling drug conspiracy, and one defendant with intimidation and murder of a cooperating government witness"); *Talley*, 164 F.3d at 1002 (there was sufficient evidence to support an anonymous jury, where there was evidence of the defendant's prior manipulation of the criminal justice system, as well as his attempt to kill the FBI agent in his case and a witness); *Marrero–Ortiz*, 160 F.3d at 776 (the district court could reasonably have believed that jurors were in harm's way, in light of an indictment charging the defendants with "membership in a sprawling drug ring that often resorted to violence in its pursuit of profits," including murder, and plots to murder federal agents and local police officers to "improve the odds at trial"); *DeLuca*, 137 F.3d at 31 (an anonymous jury was appropriate where the record showed involvement in organized crime, "a factor which strongly indicated that clandestine 'outside' assistance might be brought to bear in any effort to intimidate or punish jurors"; evidence of the defendant's "capacity and readiness to enlist criminal confederates in jury tampering plans was supported by actual precedent"; there was evidence that the defen-

dants had been involved in violent crimes; and the defendants had also attempted to tamper with witnesses and to suborn perjury in the case before the court); *United States v. Salvatore*, 110 F.3d 1131, 1143–44 (5th Cir.) (there was no abuse of discretion in empaneling an anonymous jury where the defendants were "closely connected with organized crime," the court had previously upheld empaneling an anonymous jury in an earlier trial of a co-defendant after there had been specific death threats to witnesses in that case, and another co-defendant was being investigated for witness tampering in another case, as this evidence showed that the defendants "participated in a criminal enterprise and conspired with individuals having the capacity and willingness to interfere with the judicial process"), *cert. denied*, 522 U.S. 981, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997), *overruled on other grounds by Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000); *see generally Edwards*, 303 F.3d at 613 (noting that "the paradigmatic situation justifying an anonymous jury is an organized crime trial, where the safety of others becomes an overriding concern"); *and compare Branch*, 91 F.3d at 724 ("[W]hile evidence that the defendant has in the past or intends in the future to tamper with the jury may be sufficient to warrant an anonymous jury, it is by no means necessary.").

In this case, the court finds that there is copious evidence that Honken was involved in a violent drug-trafficking enterprise, and that he engaged in murder, attempted murder, and solicitation of murder to obstruct the investigation and prosecution of his drug-trafficking. The government has offered the transcript of Honken's 1998 sentencing in the 1996 case as its primary evidence of the need for an anonymous jury in this case. The undersigned was the sentencing judge in Honken's 1996

case, and well remembers the evidence of obstruction of justice in that case. Moreover, this court summarized above the pertinent evidence, for present purposes, from that transcript. Based on that transcript, the court finds, by the preponderance of the evidence that, while on pre-trial release, Honken sought ways to "fool" his electronic monitoring ankle bracelet, so that he could attempt to eliminate or intimidate witnesses, using the monitoring bracelet as his alibi; that, while in jail on the 1996 charges, Honken actively recruited other inmates to kill or intimidate witnesses for him, promising them the means to bond out of jail, cash payments, and/or shares in the proceeds of criminal activity as inducements, and engaged in detailed planning with those accomplices to carry out the murders and intimidation; and that Honken engaged in a scheme to escape from the Woodbury County Jail, so that he could escape punishment for his offenses and wreak vengeance upon the persons that he believed had put him in jail.

Similarly, in its decision on appeal of Honken's sentencing in the 1996 case, the Eighth Circuit Court of Appeals also summarized "the extensive evidence gathered and presented concerning the defendant's continuing efforts to obstruct justice," as follows:

> We note that a reasonable finder of fact could easily conclude from witnesses' testimony that appellee caused the disappearance of one or more persons, including prospective prosecution witnesses, in 1993; attempted to kill witnesses while on pre-trial release in 1996; attempted to kill another cooperating witness whose cooperation had resulted in his detention in June 1996; attempted to escape from a county jail during the period of pre-trial detention; and finally, procured another person to conceal material evidence.

*Honken,* 184 F.3d at 973. Like the Eighth Circuit Court of Appeals, this court finds that Honken's conduct "strikes at the very heart of the administration of justice." *Id.*

The evidence from Honken's sentencing in the 1996 case plainly puts this case on a par with the circumstances in *Darden* with respect to the *nature* of the criminal enterprise to which Honken belonged as one that has been in the past, or potentially could be in the future, involved in harming jurors, *see Darden,* 70 F.3d at 1532–33, as well as other cases considering such factors. *See, e.g., Shryock,* 342 F.3d at 972 (the record showed associates who where not incarcerated and a record of previous attempts to interfere with the judicial process, for example, by killing or attempting to kill witnesses); *Brown,* 303 F.3d at 602 (the record showed that the defendants had "proven their ability to corrupt the legal system"); *Bowman,* 302 F.3d at 1238–39 (there was evidence that members of the defendant's motorcycle gang had interfered with the judicial process by seeking to intimidate witnesses); *Collazo–Aponte,* 216 F.3d at 182 (the defendants were involved in a "sprawling drug conspiracy" and one defendant had been charged with intimidation and murder of a cooperating witness); *Talley,* 164 F.3d at 1002 (there was evidence of the defendant's prior manipulation of the criminal justice system, as well as his attempt to kill a witness); *Marrero–Ortiz,* 160 F.3d at 776 (the district court reasonably believed that jurors were in harm's way, in light of membership in a drug ring that resorted to murder of law enforcement officers to "improve the odds at trial"); *DeLuca,* 137 F.3d at 31 (there was evidence of the defendant's "capacity and readiness to enlist criminal confederates in jury tampering plans"); *Salvatore,* 110 F.3d at 1143–44 (the defendant conspired with individuals with the capacity and willingness to interfere with the judicial process); *see*

*also Mansoori*, 304 F.3d at 651 ("something more" than an "organized crime" label was required, and could be demonstrated by evidence that intimidation by the defendant or associates was likely, but holding that an anonymous jury was not appropriate in that case). Thus, the evidence in this case shows that Honken has been a person who would actively pursue any means available to him, through his own actions or through solicitation of the assistance of past associates and fellow inmates, to obstruct justice, for example, through murder and intimidation. Therefore, the court readily finds, "by the preponderance of the evidence," that Honken has, in the past, engaged in conduct that shows that disclosing a list of venire members in this case, including their names and abodes, "*may* jeopardize the life or safety [of jurors]," because of his involvement with a violent criminal enterprise engaged in attempts to obstruct justice through murder, attempted murder, or solicitation of murder. *See* 18 U.S.C. § 3432 (stating the standard for an anonymous jury in a death penalty case) (emphasis added).

Even assuming that evidence of past conduct shows that Honken is willing to attempt to obstruct justice, what Honken argues is lacking here is any evidence of his present ability to do so, for example, through juror intimidation, where he is incarcerated, and the evidence of any attempts by him to obstruct justice and any evidence of his membership in an "organization" or "enterprise" with the capacity to obstruct justice is stale. *Compare Darden*, 70 F.3d at 1532–33 ("The enterprise had many members and associates who remained at large throughout the trial."). The government argues that Agent Bas-

ler's affidavit recounting information obtained from inmates concerning Honken's attempts to get someone to kill witnesses, even after he was incarcerated, demonstrates that Honken continues to have the capacity to obstruct justice, or at least continues to attempt to obstruct justice, to a degree that reasonably implicates juror safety.

The court doubts that Agent Basler's affidavit is "evidence" within the meaning of 18 U.S.C. § 3432, and so will disregard it.[4] Nevertheless, the court finds, by a preponderance of the other evidence submitted, that Honken's past participation in a group with the capacity to harm jurors, his past attempts to interfere with the judicial process, *see, e.g., Darden*, 70 F.3d at 1532, and his past attempts to reach out of his prison to harm witnesses and investigators, through associates or persons recruited for precisely such activity, *cf. id.* ("The enterprise had many members and associates who remained at large throughout the trial."), show that Honken, either by himself or through associates or an organization, still has the present or future capacity to harm jurors. In other words, this evidence shows that disclosure to Honken of a list of venire members, including biographical information such as their names and "abodes," "may jeopardize the life or safety of any person." 18 U.S.C. § 3432. The court concludes that this potential for jeopardy to juror safety becomes even clearer when the court turns to the next factor in the analysis, Honken's potential sentence in this case.

***ii. Potential sentence.*** Notwithstanding that the defendant's potential sentence is identified by the courts as one of the five factors pertinent to juror safety, Honken

---

4. Even apart from any "confrontation clause" issues that may arise from use of Agent Basler's affidavit for present purposes, where Honken clearly has had no opportunity to cross-examine anyone, the affidavit appears to be hearsay and hearsay within hearsay, to which the court doubts that a sufficient exception to the hearsay rule can be demonstrated.

argues that his potential death sentence simply cannot be used to justify an anonymous jury pursuant to § 3432, or *every* death penalty case would warrant an anonymous jury. Put another way, Honken contends that consideration of a potential death sentence as justifying an anonymous jury would allow the statutory *exception* in § 3432 to disclosure of jurors' names and abodes to swallow the statutory *rule* in § 3432 that jurors' names and abodes *must* be disclosed to the defendant in a capital case three days before trial. The court agrees that the potential death penalty cannot justify an anonymous jury, standing alone, but the court nevertheless concludes that the defendant's potential death sentence is a factor pertinent to determination of whether or not an anonymous jury is warranted, even in a death penalty case.

Again, the question in light of § 3432 is whether the defendant's potential death sentence is evidence that disclosure of jurors' biographical information "may jeopardize the life or safety of any person." 18 U.S.C. § 3432. The relevance of a defendant's possible sentence to that issue is that a potentially severe or lengthy sentence " 'surely provide[s] a strong inducement to resort to extreme measures in any effort to influence the outcome of the trial.' " *Shryock*, 342 F.3d at 972 (quoting *DeLuca*, 137 F.3d at 32, which in turn cites *Ross*, 33 F.3d at 1520). In *Shryock*, the sentences providing such "strong inducement" ranged from 384 months to life plus 300 months. *See id.* Similarly, in *DeLuca*, it was "mandatory life sentences" that provided such "strong inducement." *See DeLuca*, 137 F.3d at 32. Plainly, if the potential for a long sentence provides "strong inducement to resort to extreme measures in any effort to influence the outcome of the trial," the potential for a death penalty also provides such "strong inducement." Therefore, *at least where there is other evidence showing that the defendant has the capacity to harm jurors, and has in the past been willing to exercise that capacity*, this court concludes that the defendant's potential death sentence is also a factor weighing in favor of an anonymous jury under § 3432, because it suggests that the defendant may be under a "strong inducement" actually to use his capacity to harm jurors.

The court finds, by the preponderance of the evidence, that Honken engaged in, or attempted to engage in, murderous conduct to obstruct justice when he was facing only a sentence for a term of years on drug-trafficking charges. Where he now faces the even stronger inducement to obstruct justice arising from his potential for a death penalty, the evidence of his past obstructive conduct is not too "stale" to be relevant, but is instead given a whole new vitality in the present circumstances. Thus, in the totality of the circumstances, *see Shryock*, 342 F.3d at 971; *Brown*, 303 F.3d at 602 ("None of these factors is dispositive; rather, the decision to empanel an anonymous jury should be made on the totality of the circumstances."), Honken's potential death sentence is also a factor convincing the court, by the preponderance of the evidence, that disclosure of a list of venire persons to Honken "*may* jeopardize the life or safety of any person," including jurors. 18 U.S.C. § 3432 (emphasis added).

***iii. Extent of publicity.*** Similarly, the court finds that the last factor in the five-factor test, the extent of publicity, *see, e.g., Darden*, 70 F.3d at 1532, may have a more tenuous connection to the pertinent inquiry under 18 U.S.C. § 3432 in a death penalty case, but the connection is not nonexistent. Again, the question is not just whether there will be extensive publicity, but publicity so extensive that it " 'could enhance the possibility that jurors' names would become public and expose them to

intimidation or harassment.' " *id.* (quoting *Ross,* 33 F.3d at 1520). Thus, this factor does, at least to some extent, relate to the question under 18 U.S.C. § 3432, which is whether disclosure of the list of venire members may jeopardize the life or safety of any person. 18 U.S.C. § 3432.[5]

In this case, there will almost undoubtedly be unprecedented pre-trial and trial publicity. Not only are cases involving multiple murders rare in Iowa, but Iowa does not, itself, have a death penalty. Moreover, this is also the first death penalty prosecution in federal court in Iowa in several decades that is likely to go to trial with the death penalty still at issue.[6] Thus, it is extremely likely that this case, involving both multiple murders and the potential for a federal death penalty, will draw the most intense media attention of any trial in Iowa in decades. In such circumstances, it is likely that there will also be extraordinary interest in the identities of the persons who will not only decide Honken's guilt or innocence, but will also decide whether he will get the death penalty or life imprisonment, if found guilty. This case and the related case against Angela Johnson have already generated a significant amount of media attention. Thus, this is not the sort of case in which the court's determination to empanel an anonymous jury might, itself, stimulate otherwise non-existent media attention. *Compare United States v. Saya,* 980 F.Supp. 1157, 1158–59 (D.Hi.1997).

Moreover, even were the extent of publicity wholly irrelevant to the question of whether or not disclosure of biographical information of jurors to the defendant

---

**5.** The risk to jurors of publicity could, in theory, be eliminated simply by preventing *public* disclosure of their identities, rather than barring disclosure of their identities *to* the *parties.* However, where the disclosure of the identities of the jurors to the defendant may pose a risk to the jurors, preventing *public* disclosure to avoid media harassment is not enough.

**6.** Victor Harry Feguer was tried in the United States District Court for the Northern District of Iowa on March 1 to 12, 1961, for violation of the Kidnapping Act, 18 U.S.C. § 1201(a), convicted, and upon a jury's recommendation, sentenced to death by hanging pursuant to 18 U.S.C. § 3566 and Iowa Code § 792.9 (1958). *See Feguer v. United States,* 302 F.2d 214, 216 (8th Cir.1962). Feguer had kidnapped his victim,.Dr. Edward Roy Bartels, in Dubuque, Iowa, on or about July 11, 1960, and transported him to Illinois, where Feguer killed him. *Id.* Dr. Bartels's body was found in a rural area on the Illinois side of the Mississippi river opposite Dubuque on July 21, 1960. *Id.* The Eighth Circuit Court of Appeals, in an opinion by then Circuit Judge Harry A. Blackmun, affirmed the conviction, *see id.,* and the Supreme Court denied a petition for certiorari, *Feguer v. United States,* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962). President John F. Kennedy declined to commute Feguer's death sentence, and—purportedly after a last meal consisting of only one olive with the pit still in it, so that a "tree of peace" might grow from his grave—Feguer was hanged at the state prison in Fort Madison, Iowa, at 5:30 a.m. on March 15, 1963. *See* Ann Treneman, *Bad Things Happen To Good People,* The Times Of London, Oct. 20, 2001, 2001 WL 28998723. For thirty-eight years, until the execution of Timothy McVeigh, Feguer was the last person executed by the federal government. *See, e.g.,* Kate Santich, *Last Man To Die: Who Was Victor Feguer? Timothy McVeigh's Case Recalls The Government Execution 38 Years Ago,* Orlando Sentinel, June 9, 2001, 2001 WL 9190268.

Also, just a few years ago, the undersigned presided over the trial of several defendants in another case involving kidnapping, conspiracy to commit kidnapping, and using or carrying a firearm during the commission of a crime of violence, in violation of 18 U.S.C. §§ 1201(a), 1201(c), and 924(j) respectively, in which the prosecution originally sought the death penalty. *See United States v. Ortiz,* 40 F.Supp.2d 1073, 1076 (N.D.Iowa 1999). However, late in the pre-trial proceedings, the government withdrew its notice of intent to seek the death penalty after the "ring-leader" and most culpable defendant pleaded guilty to the charges against him in exchange for a mandatory life sentence. *See id.*

might jeopardize the life or safety of any member of the jury in a death penalty case, *see* 18 U.S.C. § 3432, the court would still be warranted in considering the extent of publicity in its determination of whether or not to empanel an anonymous jury. This is so, because the generally accepted non-prejudicial reason to be given to the jurors for their anonymity is "that they were being identified by numbers rather than their names so that members of the media would not ask them questions." *See, e.g., Darden,* 70 F.3d at 1533 (citing cases). Thus, there must be sufficient potential for media attention to the case to give credence to this explanation, or its lack of foundation might cause the jury to engage in speculation about the true reason for their anonymity, thus raising the potential that the jurors would hit upon a reason that would be prejudicial to the defendant. *See, e.g., Salvatore,* 110 F.3d at 1144 (noting that the explanation given to the jurors for their anonymity was both "plausible and nonprejudicial"). In other words, there must be sufficient media attention to a death penalty case to lend credence to the non-prejudicial explanation for anonymity given to the jury, or the court must find some other non-prejudicial explanation.

In light of the totality of the circumstances considered, the court finds, by the preponderance of the evidence, that disclosure of the list of venire members to the defendant in this case may jeopardize the life or safety of members of the jury. 18 U.S.C. § 3432. The court, therefore, turns to the question of whether adequate precautions can be taken to minimize any prejudice to the defendant from empaneling an anonymous jury.

### b. Precautions to minimize prejudice to the defendant

█ As explained above, empaneling an anonymous jury prejudices or potentially prejudices at least two of the defendant's

constitutional rights: (1) his right to a presumption of innocence, *see, e.g., Shryock,* 342 F.3d at 971 ("[A]nonymous juries may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence."); *Mansoori,* 304 F.3d at 650 (" 'An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence.' ") (quoting *Ross,* 33 F.3d at 1519); and (2) his right to trial by an impartial jury obtained through effective voir dire. *See Darden,* 70 F.3d at 1532 (empaneling an anonymous jury may interfere with a defendant's Sixth Amendment right to trial by an impartial jury); *accord Shryock,* 342 F.3d at 971 ("[T]he use of an anonymous jury may interfere with defendants' ability to conduct voir dire and to exercise meaningful peremptory challenges."); *cf. Mansoori,* 304 F.3d at 650 ("Juror anonymity ... deprives the defendant of information that might help him to make appropriate challenges—in particular, peremptory challenges—during jury selection."). The court will consider whether there are adequate protections for each of these rights in turn, as well as whether there are adequate protections from other harms identified by Honken.

### i. Presumption of innocence.

Courts agree that the principal protection for the presumption of innocence, when an anonymous jury is empaneled, is to provide a "neutral" reason for the jury's anonymity, and to instruct on the presumption of innocence. The generally approved "neutral" reason is that the jurors are being identified by numbers, rather than by names, to protect them from contact or harassment by the media or other persons interested in the case. *Shryock,* 342 F.3d at 972–73 (the district court prevented undue preju-

dice by "instruct[ing] the jury that the reason for their anonymity was to protect their privacy from curiosity-seekers," citing *Darden,* 70 F.3d at 1530, as well as "that the use of anonymous juries was commonplace in federal court, and that the reasons for the use of such a jury here had nothing to do with the [defendants'] guilt or innocence," citing *Ross,* 33 F.3d at 1521–22); *Edwards,* 303 F.3d at 615 ("[T]he district court minimized the possibility of any prejudice to the defendants by giving an explanatory jury instruction, which ... referred to the intense media publicity as the reason for anonymity and gave no indication that the jurors should fear for their safety from the defendants. It reiterated that the defendants were presumed innocent until proven guilty and that the district court was using these procedures to protect juror privacy and ensure a fair trial for both sides."); *Collazo–Aponte,* 216 F.3d at 182 ("[T]he trial judge took adequate precautions to protect the defendants' rights," where he " 'did not mention any threat to juror safety, but, rather, informed the jurors that they would remain anonymous during the trial because of publicity concerns. He then instructed the jury on the presumption of innocence, and periodically repeated that instruction as the trial progressed.' ") (quoting *Marrero–Ortiz,* 160 F.3d at 776); *DeLuca,* 137 F.3d at 32 ("[T]he district court ... satisfactorily averted any unacceptable risk of intrusion upon the constitutional rights of the individual defendants by diverting juror attention from the possible ·perception that anonymous empanelment was a safeguard against defendants' dangerousness," where · the court "inform[ed] the members of the jury that their identities would not be disclosed, so as to ensure that·no extrajudicial information could be communicated to them during trial, either by the public or by media representatives. Thus, the court explained, the constitutional right of each defendant to a jury trial, based exclusively on the evidence, would be preserved."); *Salvatore,* 110 F.3d at 1144 (the anonymous jury did not frustrate the defendants' right to a presumption of innocence, where the court's explanation that the case was high profile, and an anonymous jury would ensure both sides a fair trial by preventing "improper influences," and was not done because of an apprehension of danger, was "plausible and nonprejudicial"); *Branch,* 91 F.3d at 725 (suggesting that an anonymous jury was more, not less, likely to render a verdict based on the presumption of · innocence, and in any event, finding that the trial court gave a neutral reason for the jury's anonymity and reiterated the presumption of innocence, thus avoiding prejudice to the defendant); *cf. Peoples,* 250 F.3d at 635–36 (finding, without specific reference to the presumption of innocence, that the trial court's explanation "to the panel that this procedure [referring to them by number] was being employed to reduce the possibility that the media or others interested in the issues of this case might try to contact them" had been "reasonably calculated to ensure that the use of numbers did not cause undue prejudice"); *Darden,* 70 F.3d at 1533 (finding, without specific reference to the presumption ·of innocence, that "the District Court took reasonable precautions to ensure that the empanelment of an anonymous jury would not result in undue prejudice against the defendants" when it "told the venirepersons that they were being identified by numbers rather than their names so that members of the media would not ask them questions").

In this case, the court will give a similar "neutral" instruction that the reason for the jurors' anonymity is to protect them from contact or harassment by the media or other persons interested in the case and to ensure that their determination in the case is based on the evidence presented in

court. Such an instruction is plausible, where this court has noted above that the likelihood of extensive publicity for this case is very high. *See Salvatore,* 110 F.3d at 1144 (finding that the trial court's explanation to the jury for their anonymity was both "plausible and nonprejudicial"). This court will not, however, suggest to the jury that an anonymous jury is "routine" or "commonplace" in Iowa, when, in fact, an anonymous jury has been quite rare in this district. *Compare Shryock,* 342 F.3d at 972–73 (the district court prevented undue prejudice by "instruct[ing] the jury that . . . the use of anonymous juries was commonplace in federal court," citing *Ross,* 33 F.3d at 1521–22). Misleading the jury is not justified, even in the interest of protecting the defendant's rights. The court also deems it best to make no reference at all to whether or not anonymity is for juror safety, as the mere mention of such an issue could provoke prejudicial concern. *Compare Edwards,* 303 F.3d at 615 ("[T]he district court minimized the possibility of any prejudice to the defendants by giving an explanatory jury instruction, which . . . gave no indication that the jurors should fear for their safety from the defendants."); *Collazo–Aponte,* 216 F.3d at 182 ("[T]he trial judge took adequate precautions to protect the defendants' rights," where he " 'did not mention any threat to juror safety, but, rather, informed the jurors that they would remain anonymous during the trial because of publicity concerns.' ") (quoting *Marrero–Ortiz,* 160 F.3d at 776); *with Salvatore,* 110 F.3d at 1144 (affirming the district court's instruction, which stated, in part, that the juror anonymity was not because of an apprehension of danger). Moreover, this court has always instructed repeatedly on the presumption of innocence in criminal cases, and certainly will do so in this case. *See Edwards,* 303 F.3d at 615; *Collazo–Aponte,* 216 F.3d at 182. Thus, the court believes that reasonable precautions can be taken to protect the defendant's right to the presumption of innocence.

*ii. Impartial jury.* In both *Darden* and *Peoples,* the Eighth Circuit Court of Appeals held that the district court had taken adequate measures to ensure that empaneling an anonymous jury would not result in undue prejudice to the defendant's right to an unbiased jury, where the court conducted voir dire reasonably calculated to uncover any bias toward the issues in the case or the defendant himself. *See Darden,* 70 F.3d at 1533; *accord Peoples,* 250 F.3d at 635–36 (citing *Darden* ). Other courts are in agreement that adequate voir dire is the appropriate means of protecting a defendant's right to an impartial jury. *See, e.g., Brown,* 303 F.3d at 603 ("[T]he court's efforts to provide the defendants with sufficient information on the jurors through extensive juror questionnaires and voir dire adequately protected the defendants' rights and permitted them to select a jury intelligently."); *Edwards,* 303 F.3d at 615 (as one of its measures to ensure an impartial jury, "[t]he district court . . . questioned the jurors to determine whether they had any bias toward either party as a result of the decision to withhold their names"); *Branch,* 91 F.3d at 724–25 ("[T]here was no showing that refusing to release the names and addresses of the jury prejudiced the defendants' ability to select an impartial jury," where "[t]he court furnished the defendants with answers to 80 detailed questions submitted by the district court to prospective jurors," "[n]o defendant argue[d] that the information obtained from these questionnaires was deficient," and the parties thus had "an arsenal of information" to conduct an effective voir dire).

This court ordinarily engages in an extensive voir dire, and certainly expects to do so in this case, and also ordinarily allows, and will allow here, for extensive

voir dire by the parties, some of which will likely be conducted with individual jurors *in camera.* Moreover, the court believes that the government is correct that an extensive questionnaire should be propounded to the jury, which will provide a wealth of information relevant to selection of an impartial jury, but which will not disclose specific identity information. The court is unwilling to accept wholesale the government's proffered questionnaire, however, without first providing the defendant with an opportunity to review the questionnaire and to suggest deletions or additions. Therefore, while the court finds that adequate measures can be taken to protect the defendant's right to an impartial jury in this case, the court will direct the parties to participate in the process to develop a questionnaire with that goal in mind.[7] The results of this process, the court concludes, should alleviate any of the defendant's concerns that not being provided with the actual names of the venire members will somehow deprive him of valuable information.

However, adequate measures must also be taken to ensure that identifying information is not inadvertently disclosed in the responses to the juror questionnaires. Therefore, among other things, the court will notify potential jurors, either in a cover letter or in the questionnaire itself, that they will be kept "anonymous" owing to the likelihood of extensive media attention to the case. On each questionnaire, only a removable cover page will include a juror's name, spouse's name, precise address, and contact information, as well as his or her assigned juror identification number, although each page of the questionnaire will bear the specific juror's identification number. Clerk's Office personnel will remove and retain the cover page of each questionnaire for their records before providing copies of the completed questionnaires to the court and the parties. Also, questions regarding community of residence and nature of employment must caution the potential jurors not to reveal specific information, such as addresses or employer's names, or to identify the nature of employment in more than general terms, *e.g.,* "manufacturing assembly line worker," "architect," "farmer," "secretary."

Although the court is not convinced that any independent investigation of jurors' backgrounds is necessary, if the government persists in its insistence upon such an investigation, the court finds that something like the government's proposal for the conduct of such an investigation may be appropriate. Specifically, the court agrees that it may be appropriate to obtain an independent investigation of jurors' backgrounds *to the extent of verifying any criminal history self-disclosures.* However, the court also acknowledges that there is some merit to the defendant's fears that, if such an investigation is conducted by a government investigator, there will be a perception of bias. Therefore, the court concludes that the results of any such investigation should be reported solely to the court for redaction *in camera* and dissemination to the parties as appropriate. The court will direct the parties to confer and to propose, for the court's approval or modification, a process to perform a verification of jurors' criminal histories that in-

---

7. The government has already proposed a jury questionnaire and defendant's counsel notified the court that the defense team also intends to submit a proposed jury questionnaire. However, the court will not consider separate proposed jury questionnaires. Rather, as indicated below, the parties will be required to confer on the content of such a juror questionnaire, and then to submit to the court a *joint* proposed juror questionnaire, specifically identifying agreed and disputed questions for the court's review, modification, and approval.

volves an adequate "Chinese wall" between any investigator and the parties.

***iii. Other concerns.*** Honken suggests that, even with the measures discussed above in place, he will be deprived of the presumption of innocence or a fair or impartial jury, because of the "group dynamic" or "de-individualization" of an anonymous jury; specifically, he contends that, according to his proffered study, an anonymous jury is more likely to find a defendant guilty and more likely to impose a harsher sentence. Honken presented only one paper in support of these contentions, "The Potential Impact Of Juror Anonymity On Juror Decision–Making," by Lara Dolnik of Starr Litigation Services, Inc., in Scottsdale, Arizona. Defendant's Exhibit A. Although the conclusions of the paper are interesting, they are far from sufficient to convince this court that an anonymous jury is inappropriate.

First, the paper relies on studies that involve contrived circumstances, apparently in an attempt to find a way to compare a "control" group with a "test" group, but the study does not provide an empirical analysis of actual capital cases comparing anonymous juries and non-anonymous juries. Second, the paper did not address any study that involved the substantial safeguards for protection of the defendant's rights that courts have used when empaneling an anonymous jury, as discussed above. Third, the paper itself suggests that conducting individual voir dire, administering a supplemental juror questionnaire, and emphasizing due process concerns in individual voir dire—the very procedures courts have recognized as otherwise minimizing prejudice to the defendant—could, at least theoretically, help to minimize the effect of anonymity. *See* Defendant's Exhibit A at 15.

Moreover, the court believes that at least some of the concerns raised in Ms. Dolnik's paper can be addressed in this case by reiteration of the presumption of innocence and other instructions. Specifically, this court has used in every criminal case it has ever tried an instruction identical or substantially similar to the following:

A verdict must represent the considered judgment of each juror. Your verdict must be unanimous. It is your duty to consult with one another and to deliberate with a view to reaching agreement if you can do so without violence to your individual judgment. Of course, you must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of other jurors or for the mere purpose of returning a verdict. Each of you must decide the case for yourself; but you should do so only after consideration of the evidence with your fellow jurors.

In the course of your deliberations you should not hesitate to re-examine your own views, and to change your opinion if you are convinced it is wrong. To bring twelve minds to an unanimous result, you must examine the questions submitted to you openly and frankly, with proper regard for the opinions of others and with a willingness to re-examine your own views.

Remember that if, in your individual judgment, the evidence fails to establish the defendant's guilt beyond a reasonable doubt on an offense charged against him, then the defendant should have your vote for a not guilty verdict on that offense. If all of you reach the same conclusion, then the verdict of the jury must be not guilty for the defendant on that offense. Of course, the opposite also applies. If, in your individual judgment, the evidence establishes the defendant's guilt beyond a reasonable doubt on an offense charged, then your vote should be for a verdict of guilty against the defendant on that offense, and if all of you reach that conclusion,

then the verdict of the jury must be guilty for the defendant on that offense. As I instructed you earlier, the burden is upon the prosecution to prove beyond a reasonable doubt every essential element of a crime charged.

Remember, also, that the question before you can never be whether the government wins or loses the case. The government, as well as society, always wins, regardless of whether your verdict is not guilty or guilty, when justice is done.

Finally, remember that you are not partisans; you are judges—judges of the facts. Your sole interest is to seek the truth from the evidence. You are the judges of the credibility of the witnesses and the weight of the evidence. Such an instruction, this court believes, is sufficient to minimize any "de-individuation" or "group dynamic" that might otherwise result from juror anonymity, as it reiterates the obligation of each juror to reach an independent determination of the proper verdict based on the evidence.

Therefore, finding that the requirements of 18 U.S.C. § 3432 have been met in this case, the court will empanel a jury that is "anonymous" at least to some degree. The next question then becomes, how "anonymous" should the jury be?

### B. The Proper Degree Of "Anonymity"

#### 1. Arguments of the parties

Notwithstanding that the court's November 26, 2003, order, directed the parties, *inter alia*, to brief the question of the degree to which the jury should be "anonymous" or "innominate," only the government took advantage of that opportunity. In its response, filed December 19, 2003, the government argues that, to protect the jurors fully and to give them sufficient peace of mind to perform their duties, the court should make the jury "fully anonymous." Specifically, the government argues that the court should bar *both* parties from having any knowledge of the jurors' names, addresses, and places of employment, and should only allow disclosure of the juror's city and county of residence, and the nature of their employment. The government contends that, if the parties become aware of the jurors' addresses and places of employment, it would take little further effort to learn the jurors' identities, effectively defeating anonymity.

At the January 17, 2004, hearing, the government declined the court's invitation to identify any "middle ground" concerning anonymity. For example, the government reiterated its contention that just omitting the jurors' names from a list of venire members provided to the parties would be pointless, because any reasonable investigation of other specific information would lead directly to the jurors' identities. The government also asserted that disclosure of identity information to counsel, but not to the defendant, was impracticable, because of the risk of inadvertent disclosure, and inadvisable, because if there was any "leak" of biographical information of jurors, suspicion that the attorneys were the source of the "leak" would inevitably arise.

Honken opposes anonymity in any degree, and failed to address by written response prior to the hearing the issue of what degree of anonymity was appropriate, if the court found anonymity in some degree was required. However, at the hearing, Honken likewise rejected any "middle ground" disclosure that involved disclosure of jurors' biographical or identifying information to counsel, but not to the defendant, on the ground that such disclosure would be too difficult to manage. On the other hand, he contended that protection of jurors' identities from the media, for example, by referring to them by number during jury selection and other proceedings, would not run afoul of § 3432, and that even though the statute does not

expressly require disclosure of "names," but only a "list," it must be read to require disclosure of sufficient information to the defendant to identify the jurors. This last argument, of course, fails in light of the court's conclusion that this case falls within the exception stated in § 3432, not the rule, because the jurors must be anonymous *from the defendant*, not merely from the public or the media, to some degree to prevent jeopardy to the life or safety of jurors or their family members. When pressed, Honken's counsel conceded that it might be appropriate for jurors to disclose only their community of residence, but not their precise address. Honken's counsel also suggested that picking up the jurors at some point of assembly remote from the courthouse, then transporting them to the courthouse as a group each day of trial, might be appropriate to protect the jurors' anonymity, and would also avoid subjecting them to prejudicial influences that might arise from seeing the security measures employed to bring the defendant to court or the extent of media attention to the case.

### 2. Analysis

#### a. Degrees of anonymity

"Anonymous" juries include those about whom relatively more or less biographical information is concealed. Thus, the court must explore the degree of "anonymity" that is appropriate in this case by first examining the spectrum of possibilities.

*i. The "innominate" jury.* As explained above, in *Peoples,* a "capital case" involving prosecutions for murder of federal witnesses in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2), and 1111, the Eighth Circuit Court of Appeals affirmed the trial court's decision to provide all parties with a list of the names and places of residence of each member of the venire panel prior to trial, pursuant 18 U.S.C. § 3432, but to identify panel members in court by number rather than by name, a procedure that the appellate court concluded was authorized "in any case." *Peoples,* 250 F.3d at 635 (citing *Darden,* 70 F.3d at 1532). Thus, *Peoples* represents the lowest degree of juror "anonymity," and hence, the lowest degree of juror protection, a jury that is *"innominate" only as to the public.* However, the trial court in *Peoples* followed the procedures under 18 U.S.C. § 3432 for *disclosure* of the names and abodes of venire panel members, not the statutory procedures for *withholding* such information from a defendant based on evidence that disclosures would jeopardize the lives or safety of the jurors. *See id.* Consequently, *Peoples* provides little guidance here on the degree of "anonymity" required in a case in which the court finds that the statutory requirements for *non-disclosure* of the list of jurors and their abodes under 18 U.S.C. § 3432 have been met.

At least theoretically, a jury may also be *"innominate" as to the parties, as well as the public.* In such a case, the parties would have access to all biographical information concerning venire members except their names. Indeed, the court requested the parties' reactions to empaneling such an "innominate" jury in this case during the hearing on the government's motion for an anonymous jury. However, both parties rejected such a "middle ground" in this case, on the ground that maintaining the "innominate" status of the jury as to the defendant was impracticable or very difficult to manage during jury selection, and there was a risk that any "leaks" of information might be attributed to counsel.

*ii. Limited anonymity.* In *Edwards,* the Fifth Circuit Court of Appeals affirmed an "anonymous" jury involving "limited concealment" from the parties of juror information. The "limited concealment" involved *omission of the jurors'*

names and places of employment, and, regarding their residences, the release of their zip codes and parishes, but not their exact addresses. *Edwards,* 303 F.3d at 612. However, "[d]espite the lack of access to this information, the parties were able to view a large amount of other information about the venirepersons, including a twenty-eight page questionnaire consisting of 116 questions, some with subparts. Moreover, they were allowed to propose questions for potential jury members and ask follow-up questions." *Id.* The appellate court observed,

> In referring to such juries as "anonymous," we have previously cautioned against "painting with too broad a brush." *Branch,* 91 F.3d at 723. As in *Branch,* the jury here was "anonymous" only "in the most literal sense." *Id.* The parties had access to the jurors' zip codes, parishes, and the extensive information contained in the long questionnaire.

*Edwards,* 303 F.3d at 614; *see also Bowman,* 302 F.3d at 1236 n. 1 (referring to the jury as "innominate," rather than "anonymous," even though the trial court withheld the jurors' names, addresses, and places of employment, "because, after a thorough voir dire, the parties knew everything about the jurors except their names.") (citing *United States v. Carpa,* 271 F.3d 962, 963 n. 1 (11th Cir.2001), *cert. denied,* 535 U.S. 946, 122 S.Ct. 1338, 152 L.Ed.2d 242 (2002)). Similarly, in *Branch,* "the district court ordered only the jurors' names and addresses be withheld from the parties." *Branch,* 91 F.3d at 723 (contrasting this degree of "anonymity" with more extensive withholding of jurors' biographical information in *Ross,* discussed *infra*).

Again, at least theoretically, there is a "middle ground," in which biographical information, such as the jurors' names and places of employment, their zip codes or communities, or even their precise ad-

dresses, could be *disclosed to counsel for both parties, but not to the defendant.* Such an approach appears to satisfy the concerns justifying an anonymous jury under 18 U.S.C. § 3432, that is, that disclosure of juror information to the defendant may jeopardize the life or safety of any person. However, as mentioned above, both parties rejected such a "middle ground" in this case, on the ground that maintaining anonymity as to the defendant was impracticable or very difficult to manage during jury selection, and there was a risk that any "leaks" of information might be attributed to counsel.

***iii. A high degree of anonymity.*** A much higher degree of anonymity was affirmed by the Ninth Circuit Court of Appeals in *Shryock,* in which the trial court "empaneled an anonymous jury by ordering that the names, addresses, and places of employment of prospective jurors and their spouses not be disclosed to counsel, either before or after selection of the jury panel." *Shryock,* 342 F.3d at 970. Similarly, in *Ross,* the Eleventh Circuit Court of Appeals affirmed withholding from the parties the jurors' names, addresses, places of employment, and spouses' names and places of employment. *Ross,* 33 F.3d at 1519.

***iv. An anonymous and sequestered jury.*** Finally, the court may empanel a jury that is both "anonymous," in that jurors' biographical information, including the jurors' names, addresses, and places of employment, would not be disclosed to the parties or the public, and "sequestered," that is, held in the care of the United States Marshal Service throughout the trial. *See Talley,* 164 F.3d at 1001 (the trial court granted the motion for an "anonymous" jury, but denied the motion for a "sequestered" jury); *see also Brown,* 250 F.3d at 916–17 (discussing the purposes of jury sequestration); *United States v. Lee,*

886 F.2d 998, 1001 (8th Cir.1989) (the jury was sequestered, and referred to by number while in court, but the jury was not "anonymous," because defendant's counsel were provided with the names of jurors), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).

### b. The degree of anonymity required here

■ The court is satisfied that, considering the evidence justifying an "anonymous" jury, a jury that is merely "innominate" as to either the public or the parties is insufficient to prevent the potential harm justifying an exception to disclosure under 18 U.S.C. § 3432. *See, e.g., Peoples,* 250 F.3d at 635. Plainly, a jury that is "innominate" only as to the public does not prevent disclosure of juror information to the defendant in such a way that the disclosure may jeopardize the life or safety of the jurors or their family members. Similarly, although the degree of anonymity provided by a jury that is "innominate" as to the parties, as well as the public, would appear to provide the jury with greater protection, both parties in this case recognized at the hearing that there was but a small step from knowledge of a juror's address or other identifying information, such as the juror's employer, to the juror's identity. Thus, a jury that is "innominate" as to the parties is insufficient under the circumstances of this case, as it does not prevent the harm justifying an exception to disclosure under 18 U.S.C. § 3432.

As mentioned above, neither party advocates in this case any "middle ground" approach to juror anonymity involving disclosure of jurors' biographical information to counsel for the parties, but not to the defendant. The court agrees with the parties that such an approach involves a substantial risk of inadvertent disclosure of jurors' biographical information to the defendant that would involve the very risk of harm that justifies an exception to disclo-

sure under 18 U.S.C. § 3432. The court also acknowledges that, as yet, no party has requested the highest degree of anonymity, involving both "anonymity" and "sequestration," and the court will not impose such a high degree of anonymity *sua sponte,* at least as the circumstances known to the court at this time now stand.

However, the defendant suggests that some "limited concealment" from both the parties and the defendants might be adequate, involving disclosure of the community in which a juror resides, but not a precise address, and the nature of a juror's employment, but not the name or address of the employer. *See Edwards,* 303 F.3d at 614; *Bowman,* 302 F.3d at 1236 n. 1; *Branch,* 91 F.3d at 723. The government contended in its written submissions that a "fully anonymous" jury is appropriate in the circumstances of this case. *See Shryock,* 342 F.3d at 970; *Ross,* 33 F.3d at 1519. Indeed, at the hearing, the government asserted that any "middle ground" was "fraught with peril." However, in its written submissions and again at the hearing, the government also clarified that what the government meant was non-disclosure of names, addresses, employers, and employers' addresses, but that it might be permissible to disclose a juror's community of residence and the "nature" of his or her employment. Indeed, the government's proposed questionnaire includes questions addressed to these matters.

The court agrees with the parties that disclosure of a juror's community of residence and the "nature" of his or her employment, or the "nature" of his or her spouse's employment, probably does not implicate the harm that the exception to disclosure in 18 U.S.C. § 3432 was intended to prevent. Moreover, such information can provide valuable assistance to the parties in the course of jury selection.

*See, e.g., Ross,* 33 F.3d at 1519 n. 22 (noting the purposes served by disclosure of jurors' biographical information during jury selection). Therefore, such "limited disclosure" will be ordered in this case. However, the court concludes that, otherwise, the information to be withheld from the parties in this case, to serve the interests of jury protection identified in 18 U.S.C. § 3432, are the jurors' names, addresses, and places of employment, and the names of spouses and their places of employment, either before or after selection of the jury panel. *Shryock,* 342 F.3d at 970; *Ross,* 33 F.3d at 1519. The court also reiterates its conclusion that, notwithstanding these limitations on disclosure of jurors' biographical information, it is appropriate in this case for the parties to propose, and the court to approve, and if necessary, modify, an extensive juror questionnaire to assist the parties in conducting an effective voir dire. *See Edwards,* 303 F.3d at 614; *Bowman,* 302 F.3d at 1236 n. 1; *Branch,* 91 F.3d at 723. The court also deems it appropriate to require that, once the jury has been selected, the United States Marshal's Office should direct the means for assembling the jurors each day at a location away from the courthouse and bringing them to court together. This measure is necessary, the court finds, to protect juror anonymity and to guard against exposure of the jurors to improper influences, such as might arise from exposure of the jury to the security measures involved in bringing the defendant to court or the extent of media attention to the case.

## C. Further Prohibitions On Disclosure Of Juror Identity

Finally, the court turns to the issue of the extent to which prohibitions upon disclosure of identifying information about jurors, or attempts to discover such information, should be imposed upon the parties, their counsel, court and clerks' office personnel, and the news media. Although the defendant failed to respond to the court's request to brief this issue prior to the hearing, the government did. The government argues that the court should prohibit disclosure of jurors' identities to the parties, their counsel, and the news media, and should prohibit the parties and counsel from attempting to discover the jurors' identities. However, the government asserted that the court should use caution in issuing any order that would appear to prohibit the media from reporting what they learn from public information or what they see in court, such as the appearance of jurors or information revealed in open court during jury selection. Thus, the government asserts that any order addressing the media should be limited to prohibiting the media from attempting to discover information about the jurors through confidential court records or from court personnel.

The court finds that the government's cautions are well taken and, indeed, are in line with the primary judicial decision specifically considering pertinent questions in a criminal case, which this court cited in its November 26, 2003, order. In *United States v. Brown,* 250 F.3d 907 (5th Cir. 2001), the Fifth Circuit Court of Appeals carefully considered the question of "how far a trial court may go, consistent with the First Amendment, in enforcing an order on juror anonymity." *Brown,* 250 F.3d at 913–14. The court found that there appeared to be "an area of agreement" between the relative positions of the news media and the government on this issue: "[T]he court could determine that maintaining jury anonymity was necessary to prevent extraneous harassment and intimidation of jurors. It could [then] enter an order preventing court personnel from disclosing, or the media from eliciting official court records that would identify jurors." *Id.* at 914. The bone of contention was whether the trial court's "non-circum-

vention order" improperly threatened to proscribe independent news-gathering, that is, any story not derived from confidential court records that might deal with jurors. *Id.* The court noted that prohibitions on "interference" and "circumvention" were ambiguous, but that, to the extent that the court intended to proscribe access to sources of information not available to the public, such as inspection of documents not a matter of public record, including jurors' names and addresses, such an order did not constitute an unconstitutional prior restraint. *Id.* at 914–15. Moreover, the court concluded that it was proper for the court's order to warn the media not to publish information illegally gleaned from confidential court files, and to deny the media access to government information or sources of information within the government's control. *Id.* at 915.

However, in *Brown,* the appellate court found that the question of whether or not the trial court could proscribe independent news-gathering was more complicated. The court ultimately concluded, albeit "[w]ith considerable doubt," that, under the standards set forth in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), "the [trial court's] non-circumvention orders were unconstitutional insofar as they interdicted the press from independent investigation and reporting about the jury based on facts obtained from sources other than confidential court records, court personnel or trial participants." *Brown,* 250 F.3d at 917–18. The appellate court explained the basis for its doubts, as follows:

> Our doubt is based on the uncertainty whether the press would have cooperated with an anonymous jury order whose enforceability was so limited. Can it be that the First Amendment prevents a court from *fully* enforcing orders it strongly believes necessary to protect jurors, the jury system and the defendant's fair trial rights? Since the Supreme Court has not in recent history upheld any limit on the press, we decline to be the first court to do so.

*Brown,* 250 F.3d at 918 (emphasis added; footnote omitted). However, the court also expressed its hope "that the press understand that their enormous power under the First Amendment should be tempered with respect for the judicial system that protects the press as well as criminal defendants and that inherent in such respect there should be deference to the spirit of the court's anonymous jury order." *Id.*[8]

In the present case, the court will try to embrace the lessons taught by *Brown* in crafting a ruling regarding public disclosure by the parties, their counsel, court and clerks' office personnel, and the news media. First, having concluded that maintaining jury anonymity is necessary in this case to prevent extraneous harassment and intimidation of jurors, and more specifically, to prevent jeopardy to the life or safety of jurors and their families, *cf. id.* at 914; 18 U.S.C. § 3432, this court concludes that it may enter an order preventing the parties, counsel, or court or clerk's office personnel from disclosing, or the media from eliciting, official court records that

---

**8.** The court in *Brown* also addressed the trial court's orders denying post-verdict access to juror information. *See Brown,* 250 F.3d at 918–22. However, consideration of that issue in this case, which is still in the pre-trial stages, would be premature.

Related issues are also considered in *Phoenix Newspapers, Inc. v. United States District Court for the District of Arizona,* 156 F.3d 940 (9th Cir.1998) (media access to closed portions of jury selection voir dire), and *United States v. King,* 140 F.3d 76 (2d Cir.1998) (media access to transcripts of closed proceedings). However, consideration here of the issues raised in these cases would also be premature.

would identify jurors. *Cf. id.* Such an order, the court concludes, may also warn the media not to publish information illegally gleaned from confidential court files, and to deny the media access to government information or sources of information within the government's control. *Id.* at 915. The court also believes that such an order should encompass any official court records, including this ruling, detailing the parties' contentions for or against an anonymous jury and the court's reasons for empaneling an anonymous jury, apart from whatever instruction the court ultimately gives during jury selection concerning the reasons for juror anonymity. This addition to the prohibitions approved in *Brown* is necessary, in this court's view, to attempt to prevent or minimize any prejudice to the defendant that might arise from empaneling an anonymous jury. However, nothing in such an order should be construed as intended to interdict the press from independent investigation and reporting about the jury based on facts obtained from sources other than confidential court records, court personnel, or trial participants. *Id.* at 917–18. With that caveat in mind, the court nevertheless echoes the hope of the Fifth Circuit Court of Appeals in *Brown* "that the press understand that their enormous power under the First Amendment should be tempered with respect for the judicial system that protects the press as well as criminal defendants and that inherent in such respect there should be deference to the spirit of the court's anonymous jury order." *Id.* at 918.

### III.  CONCLUSION

Having balanced the interests in juror safety against the defendant's interests in the presumption of innocence and an impartial jury, and the existence of adequate means to protect the defendant's rights, even if an anonymous jury is empaneled, and having considered the requirements of 18 U.S.C. § 3432 that must be met before the court can withhold from the defendant biographical information about potential jurors, the court finds, by the preponderance of the evidence, that disclosure of the list of venire members and biographical information about them to the defendant in this case may jeopardize the life or safety of members of the jury or their families. *See* 18 U.S.C. § 3432. Under the circumstances presented here, an anonymous jury is warranted.

THEREFORE, the government's September 16, 2003, Motion For Anonymous Jury (docket no. 150) is **granted as follows:**

1.  **Degree of anonymity.** The jury shall be "anonymous" to the following extent: Jurors' names, addresses, and places of employment, and the names of spouses and their places of employment, will not be disclosed to the parties, their counsel, or the public, either before or after selection of the jury panel. However, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, shall be disclosed to the parties, their counsel, and the public.

2.  **Juror questionnaire.** The parties shall propose, and the court shall approve, after making any necessary modifications, an extensive juror questionnaire to assist the parties in conducting an effective voir dire. **On or before March 1, 2004,** the parties shall confer on the content of such a juror questionnaire, and shall submit to the court a **joint proposed juror questionnaire,** specifically identifying agreed and disputed questions for the court's review, modification, and approval.

3.  **Verification of jurors' self-disclosures of criminal histories.** Also **on or before March 1, 2004,** the parties shall confer and shall submit for the court's approval either joint or separate proposals for verification of jurors' self-disclosures of

criminal histories involving an adequate "Chinese wall" between any investigator and the parties.

**4. Assembly and transportation of jurors.** In order to protect juror anonymity and to prevent the jurors from being subjected to improper, extrajudicial influences, once a jury panel is selected, **the United States Marshal's Office** is directed to determine the means for assembling the jurors each day of trial or deliberations at a location away from the courthouse and bringing them to court together.

**5. Further prohibitions on disclosure of jurors' identities.** Prior to the date on which the juror questionnaire, described in paragraph 2, is sent to the prospective jurors, the court will, by separate order, impose prohibitions on public disclosure to or by the parties, their counsel, court and clerks' office personnel, and the news media of any confidential juror information, as explained herein.

**IT IS SO ORDERED.**